FOLSOM ENGRAVING COMPANY *vs.* WILLIAM McNEIL & others.
WRIGHT COMPANY *vs.* SAME.

Suffolk.    November 18, 1919. — March 20, 1920.

Present: RUGG, C. J., BRALEY, DE COURCY, PIERCE, & JENNEY, JJ.

*Labor Union.    Strike.    Unlawful Interference.    Equity Pleading and Practice.*

A contract submitted by a labor union to an employer, whereby, after its acceptance, preference in employment would be given to union workmen by notifying the union officials when additional journeymen and apprentices were needed and all contracts of employment would be submitted and executed in accordance with the union's by-laws and constitution, in effect would force the employer to maintain a shop in which were employed only union workmen, although the contract also provided that, if the union could not furnish and supply competent help, the employer might secure such help from other sources.

The officers of a labor union endeavored to persuade an employer, maintaining "a shop in which were employed both union and non-union workmen," to enter into an agreement with the union establishing hours, wages and conditions of work, under which preference in employment would be given union workmen and all contracts of employment would be submitted and executed in accordance with the union by-laws and constitution, no employee of six weeks' standing would be laid off temporarily owing to slackness of work, and all disputes, with the exception of those arising from wages, hours and apprenticeship rates, would be submitted to an arbitration committee composed in part of members of the union. The employer refused to consider the contract and the officers of the union thereupon called a strike in the employer's shop, established picketing and caused letters to be sent to the employer's customers and employees urging a boycott of the employer. In a suit in equity brought by the employer against the officers and members of the labor union, it appeared that the picketing was conducted in a coercive manner with threats and scurrilous language for the purpose of rendering the employment of the employees uncomfortable or unbearable and of causing them to leave their employment, and that the purpose of the strike and boycotting letters was to compel the employer to accept the union agreement. *Held,* that

(1) The purpose of the strike was unlawful;

(2) The officers and members of the union were not protected by St. 1913, c. 690, which was applicable only to a lawful strike lawfully conducted;

(3) The employer was entitled to injunctive relief.

TWO BILLS IN EQUITY, filed in the Supreme Judicial Court on June 23, 1919, to enjoin the officers and members of the Photo Engravers' Union of Boston from prosecuting or encouraging a strike in the plaintiffs' establishments, interfering with employ-

ment contracts of the plaintiffs or otherwise endeavoring to compel the plaintiffs to enter into a contract with the union.

Without the filing of answers by the defendants, the suits were referred to a master "to hear the parties and their evidence upon the question of the issuing of a preliminary injunction as prayed for, to find the facts, and report thereon to the court." The master filed a first report and, after its recommittal to him, a supplemental report.

Material parts of the contract which the union desired the plaintiffs to agree to were as follows:

"In order to secure careful and competent fellow servants and to diminish so far as possible the risks and dangers incident to those engaged in the art of photo engraving, the employing photo engravers of Boston agree that in their employment of journeymen and apprentices they will give preference to the members of the Boston Photo Engravers' Union, No. 3, I.P.E.U., by notifying the Union officials when additional journeymen or apprentices are needed. If the Union cannot furnish and supply competent help, the employer may secure such help from other sources.

"And it is distinctly understood and agreed that the said employing photo engravers shall assist the officials of the Boston Photo Engravers' Union, No. 3, I.P.E.U., in having their members comply with all their obligations to said Union. . . .

"That forty-eight hours shall constitute a full week's work. The working hours shall be between 8 A.M. and 6 P.M. for day work and between 5 P.M. and 8 A.M. for night work. That the quitting time on Saturday shall not be later than 12 : 30 noon. Jan. 1, 1920, 44 hours shall constitute a week's work.

"Should it be deemed necessary to reduce the working hours this can only be done provided the notice of such change be given at least one week prior to reducing said working hours. Such reduction shall be equal on each day of the week and shall affect the entire working force and that the regular overtime rates be paid for all such work as may be done outside of the hours designated as working hours in said reduction.

"That those employed in a permanent position are not to be laid off temporarily owing to slackness of work. A permanent position to be considered when an employee has been employed for a period of six consecutive weeks. . . .

"That all disputes that may arise, not covered by this agreement, shall be submitted to an Arbitration Committee consisting of two from each party to this agreement, and if this committee shall fail to agree, then said four members shall choose a fifth, who shall be a disinterested party. Said fifth member shall be chosen by said four members within ten days from their failure to agree. Said Committee shall render its decision within three weeks from the time of the appointment of said fifth party.

"During the time of said arbitration, no strikes or lockouts shall be engaged in by either party to this agreement. Wage scale, hours and the apprentice ratio as well as the Constitution and Laws of the Boston Photo Engravers' Union of N.A. and the Constitution and By Laws of the I.P.E.U. shall not be subject to arbitration.

"That no contracts, individual or otherwise, conflicting with this agreement be entered into, and all contracts of employment must be submitted and executed in accordance with the By Laws and Constitution of the I.P.E.U.

"This agreement shall be in effect from April 22, 1919, to April 21, 1920, and shall continue from year to year unless either party gives a thirty-day notice of their desire to change."

Material findings of the master were as follows:

"Prior to the strike, both of the plaintiffs had employed in their shops such labor as was necessary to their work without regard to whether the employees were or were not members of labor organizations. When the strike was inaugurated a large part of the force in each of the shops quit work and went on strike. Some of the employees who quit work were members of the Photo-Engravers' Union and some were not. Some were members of other labor organizations and a few were not members of any organization.

"After the inauguration of the strike, the plaintiffs secured men and women to work in their shops to fill, so far as possible, the places of the employees who had gone on a strike. . . .

"Every business day since the strike was inaugurated groups of men numbering from two or three to more than a dozen have congregated about or near the entrances of the places of business of the plaintiffs at the hours of opening and closing and during the noon hour and have sought to talk with employees as they

came to or left the places of business. These men were not all of them identified by the evidence as being members of the union, but it was made to appear from the evidence that the larger part of them were members of the union and were acting under instructions by the strike committee of the union. . . .

"Without attempting to go into all the specific instances I find that it is almost of daily occurrence that men who were employed in the shops of the plaintiffs have been approached by the pickets and asked to leave their work and join the strikers; that in all instances when employees were approached for the first time they were addressed in a respectful manner by the pickets, who sought to argue with them and to convince them of the justness of the cause of the strikers; that in some instances these methods were successful, but that in other instances the employees declined to talk with the pickets and requested that the pickets refrain from attempting to talk with them, but the pickets insisted that they should talk with them and have assembled about the employees in groups of sufficient numbers to make progress of the employee upon the streets difficult and unpleasant, and have talked in loud tones and have used language to the employee which was disagreeable and even abusive; that in some instances when an employee had plainly told the pickets that he did not care to talk with them, groups of the pickets numbering from two to five or six have followed the employee along the streets for a long distance, and into restaurants and street cars, and to their homes; that in some instances the persons who were following an employee have talked in loud tones and used language which attracted public attention to the employee and embarrassed him; that in some instances persons who were in the groups have called employees 'strike-breakers,' 'scabs,' 'dirty rats,' 'son of a b—,' and other vulgar names, accompanied by profanity; that in one instance two of the employees of the Folsom Company were followed by two men for a long distance upon the public streets, during which time the men who were following repeatedly called them objectionable names and, while one of the employees was talking with a lady acquaintance whom he met, one of the men who were following approached and said in a tone which could be heard by the lady, 'My girl would n't talk with a strike breaker,' and that upon leaving the lady and walking a little further upon

the street one of the men who were following struck one of the employees, but the man who made the assault was not known to the employee and it was not made to appear whether he was one of the defendants, though it was made to appear that the other man who was with him was one of the defendants; that in one instance an employee of the Folsom Company who was also a professional dancer who secured engagements at public dance halls was repeatedly interviewed by the pickets and was told by one of the members of the union that, if he did not leave the employ of the Folsom Company, the defendants would see the proprietor of a dance hall at Revere Beach, where the dancer had been employed on one occasion and had promises of other engagements, and tell him not to again employ the dancer, and that since that time he has not been able to secure any engagements to dance at that hall; that in two or more instances employees have been told by men in the groups of pickets that unless they left their employment they would have 'their heads kicked in;' that one of the employees who had testified in the hearings was met by four pickets as he left the shop the night after he had testified and one of the pickets called him a 'G— d— son of a b—,' and one of the pickets said 'G— d— you. Look out for your life. You are going to get killed some day.' . . .

"From all of the evidence I find that the use of the methods employed by the pickets as hereinbefore related was for the purpose of rendering the employment of the employees of the plaintiffs uncomfortable or unbearable and thus cause them to leave their employment. . . .

"During the progress of the strike the strike committee of the union have from time to time sent circular letters to persons employing photo engravers in Boston and elsewhere; to persons employed by photo-engraving concerns; to printers and publishers; and to persons with whom the plaintiffs were doing business or would be likely to do business. . . .

"One of the circular letters which was sent to employees of the plaintiffs and others was as follows: 'Dear Sir: In carrying on our fight for the right of collective bargaining we have in mind a publicity campaign to the general public to leave all fair minded persons know the men who are in sympathy and those who are opposed to us in our efforts to better conditions. To do this we

are preparing a list which will contain the names and addresses and other interesting information of all men not friendly to our movement to be read at all union meetings and other organizations, social, fraternal, political otherwise. In this manner every person will be known in their true color amongst their neighbors and friends. We will appreciate hearing from you at your earliest convenience as to your intention of affiliating with this organization as we want this list to contain only the names of those who are not in sympathy with our movement and not abreast of the times and who will not concede and help in the fight of the workers to organize and protect themselves through the medium of an organization and by collective bargaining. This list of unfair workers will be prepared not later than Monday, May 5th. Very truly, Organizing Committee, Photo Engravers Union No. 3'

"A circular letter was sent to printers and publishers, and others, among whom were customers of the plaintiffs, which read as follows:

"'Dear Sir: In these trying days when all good Americans are doing their level best to maintain industrial peace and the elimination of Bolshivism, it might interest you to know that there exists in the city of Boston in the Photo Engraving Craft a small group of employers who deny the right of the worker to organize, and in order to maintain their unfair attitude are paying wages to strike breakers and unskilled labor far in excess of what the skilled Bostonian asks. The justice of our cause may best be gauged by the fact that the Boston Typothetae Board of Trade made up exclusively of employing printers in a letter issued May 14th, 1919 has denied any connection with or interest in the attitude of the following firms, despite rumors or statements to the contrary. These below-named firms are attempting here in the city of Boston to foist upon us the policies of Lenine-Trotsky (rule or ruin).

| | |
|---|---|
| American Engraving Co. | Folsom Engraving Co. |
| Burbank Engraving Co. | Franklin Engraving Co. |
| F. O. Clark Engraving Co. | High Engraving Co. |
| W. J. Dobbinson Engraving Co. | Journal Engraving Co. |

Wright Engraving Co.

"'Seventy-five percent of our members are at present employed under mutual understandings with employers who believe in American ideals. We ask your cooperation as a user of photo-engraving and respectfully urge that you patronize concerns who believe in the American principles of collective bargaining and justice to both employer and employees, are able to give you both quality and service. We will gladly supply you with a full list of such concerns.

"'We trust that we will receive your earnest cooperation in eliminating Bolshivism from the printing industry.

"'We have been denied the right of collective bargaining.

"'We are NOT demanding a closed shop.

> Yours for Americanism,
> > Organizing Committee,
> > > Boston Photo Engravers Union No. 3.'"

After the filing of the reports of the master, the suits by agreement were reserved by *Loring*, J., on the reports of the master for final determination by the full court on the merits.

St. 1913, c. 690, referred to in the opinion is as follows: "No person shall be punished criminally, or held liable or answerable in any action at law or in equity, for persuading or attempting to persuade by printing or otherwise any other person to do anything, or to pursue any line of conduct not unlawful or actionable or in violation of any marital or other legal duty, unless such persuasion or attempt to persuade is accompanied by injury or threat of injury to the person, property, business or occupation of the person persuaded or attempted to be persuaded, or by disorder or other unlawful conduct on the part of the person persuading or attempting to persuade, or is a part of an unlawful or actionable conspiracy."

*W. M. Noble*, for the plaintiffs.

*D. V. McIsaac*, (*D. F. Dwyer* with him,) for the defendants.

BRALEY, J. The master reports that at a meeting of the local union, a voluntary association, of which the defendants are respectively the president and secretary, the other members being too numerous to be joined as parties though properly represented by the officers and members named, it was voted to submit to the "photo-engraving establishments of the city of Boston" a

form of proposed contract conferring on the union the absolute right of "collective bargaining," and of preferential employment with a minimum wage scale, and that permanent employees should not be temporarily "laid off" even if there was not sufficient work to keep them employed. It was further provided that the ratio of apprentices to journeymen should be immutably fixed and that all disputes not covered by the agreement should be submitted to an arbitration committee of two from each party, but, if they failed to agree, a fifth member was to be chosen by the committee. And "No contracts, individual or otherwise, conflicting with this agreement be entered into, and all contracts of employment must be submitted and executed in accordance with the" by-laws and constitution of the international photo-engravers union with which the local union was affiliated. The agreement having been presented to the plaintiffs who are engaged in the business of "photo-engraving" and whose workmen included a large number of union men, was not accepted. The union because of non-acceptance voted to strike, and the employees who were members of the union ceased to work, forcing the plaintiffs to secure in so far as possible men and women to succeed them, some of whom entered into written contracts of service.

The question for decision is not, whether an individual employee who has contracted to perform labor can abandon his contract, leaving his employer to whatever remedy in damages he may have. It is, whether by concerted action, using the strike as a mass weapon, the defendants could lawfully compel the plaintiffs to yield to their demands. The proposed agreement was presented as an entire contract to be unconditionally accepted. If the plaintiffs declined to enter into the agreement, the underlying purpose manifestly was to enforce acquiescence through the coercive power of a strike, which, even where there is both a legal and illegal purpose, is of itself illegal. *Baush Machine Tool Co.* v. *Hill*, 231 Mass. 30, 36. The provision that the employer must retain and pay more employees than were actually or reasonably required for carrying on his business, and that disputes not covered by the agreement must be submitted to arbitration, even if proper subjects for negotiation where the parties are willing to negotiate, were, until accepted, mere proposals, the refusal of which was wholly insufficient to justify the measures adopted

by the defendants. The plaintiffs could not be compelled to make an involuntary contract, or to substitute compulsory arbitration for due process of law. *Haverhill Strand Theatre, Inc.* v. *Gillen,* 229 Mass. 413. *Reynolds* v. *Davis,* 198 Mass. 294.

But these provisions, while material and important, comprise a part only of a general plan to compel the plaintiffs, who were employing non-union as well as union labor, "to unionize" their shops. The record states that, prior to the vote to strike which followed the declination of the agreement, no disagreement or controversy had arisen between the plaintiffs and their workmen. It is true the agreement reads, that the plaintiffs in the employment of journeymen and apprentices will give preference to union men by notifying the union officials when additional journeymen and apprentices are needed, and if the union cannot furnish and supply competent help, the employer may secure such help from other sources; and no express requirement is found for the discharge of non-union men already under employment. No prolonged discussion however is needed to make plain that this was merely an indirect method which must culminate in a closed shop. The position of non-union employees under the practical working of the agreement would gradually become so unbearable and intolerable that, as they retired and were gradually eliminated by the process of selection, the plaintiffs necessarily must resort solely to union workmen to recruit their industrial force. It is unnecessary to consider what the status of the parties would have been if the agreement had been mutually accepted and executed. See *Minasian* v. *Osborne,* 210 Mass. 250; *Hoban* v. *Dempsey,* 217 Mass. 166; *Shinsky* v. *O'Neil,* 232 Mass. 99; *Smith* v. *Bowen,* 232 Mass. 106.

The right of the plaintiffs at all times to hire in the labor market, and to retain in their employment, such workmen as they might choose, unhampered by the interference of the union acting as a body through the instrumentality of a strike, or of a boycott, or of a black list, is a primary right which has never been abrogated but remains unimpaired by our decisions. *W. A. Snow Iron Works, Inc.* v. *Chadwick,* 227 Mass. 382, 389. *Folsom* v. *Lewis,* 208 Mass. 336. The distinction between the cases at bar and *Pickett* v. *Walsh,* 192 Mass. 572, and kindred decisions, where the strike was inaugurated for the sole purpose of getting

all the work on a particular job for members of the union who already had obtained a part of it, and a strike for the purpose of doing away with non-union labor altogether, and, by gaining a general monopoly of the labor market, to force employers to deal only with union men, is plain. The master reports that in furtherance of their efforts to bring the plaintiffs to terms, picketing, as well as intimidation of employees who continued to work for the plaintiffs by the use of scurrilous language and abusive epithets, and individual boycotting have been resorted to in various forms more or less offensive and oppressive. It is also found that strenuous attempts have been made to induce workmen, employed by the plaintiffs to take the places of the strikers, to break their contracts of employment, and to depart from the city, and to remain in other localities. But, not satisfied with these methods insistently practised, the report further states, that the defendants in various printed or written communications characterized and held up the plaintiffs as being unfair to and prejudiced against union labor, and have endeavored by a circular letter to persuade their customers to boycott the plaintiffs and to cease business dealings with them.

The St. of 1913, c. 690, an act to define the extent to which peaceful persuasion is permitted, is invoked as a shield for what has been done. But the statute is applicable only to a lawful strike lawfully conducted. It is unavailing as a defence on the present record. The prayer for the assessment of damages has been waived, and, the defendants having deliberately, intentionally and unlawfully entered upon a course of procedure materially interfering with the right of the plaintiffs unmolested to carry on business in their own way, the plaintiffs are respectively entitled to a decree with costs awarding injunctive relief, the terms to be settled by a single justice. *Berry* v. *Donovan,* 188 Mass. 353. *Cornellier* v. *Haverhill Shoe Manuf. Association,* 221 Mass. 554. *Shinsky* v. *Tracey,* 226 Mass. 21. *W. A. Snow Iron Works, Inc.* v. *Chadwick,* 227 Mass. 382. *Martineau* v. *Foley,* 231 Mass. 220.

*Ordered accordingly.*