UNITED SHOE MACHINERY CORPORATION *vs.* CHARLES
W. FITZGERALD & others.

Essex.   December 6, 1920. — March 3, 1921.

Present: RUGG, C. J., BRALEY, DE COURCY, & CROSBY, JJ.

*Labor Union. Strike. Unlawful Interference. Equity Pleading and Practice,*
*Decree.*

An individual contract of employment entered into by an employer with his em-
ployee for the term of one year, with provision for an extension for another
year, whereby the employee agrees to work for the employer to the best of his
skill and ability and in accordance with factory regulations during regular
working hours and the employer agrees to pay him a stated rate per hour or the
prevailing piece rate, is valid and may be required by the employer as a condi-
tion precedent to employment.

The right of the employer to impose as a condition precedent to employment
the terms of the above described "individual contract" is not cut down nor
abridged by the fact that a motive of the employer in obtaining the contract is
to weaken the influence of a labor union and to impair the power of the strike.

A corporation which employed both union and non-union workmen made "in-
dividual contracts" of employment, as above described, with many of its em-
ployees. A labor union having members among the employees endeavored to
persuade the employer to desist from making individual contracts and to bar-
gain collectively with the employees. The employer declined to comply. The
officers of the union called a strike in the employer's factory, established picket-
ing and issued circulars calling for assistance. In a suit in equity brought by
the employer against the officers, agents and members of the union to enjoin
the strike, there was evidence upon which a master, to whom the suit was re-
ferred, found that a purpose of the employer in making the "individual con-
tracts" of employment was to weaken the influence of the union and to impair
the power of the strike and that the purpose of the strike, picketing and cir-
culars was to compel the employer to abandon making "individual contracts."
There also was evidence that the union maintained relays of pickets from
twenty-five to seventy-five in number who patrolled the streets in the vicinity
and at the main entrance to the factory and called in a loud voice "There is a
strike on" "This plant unfair to organized labor" "Strike honor" "Don't be
yellow" "Join us and help win." The suit was heard upon the master's report
by a judge who confirmed the report and ordered a decree enjoining the strike.
Upon appeal from that decree it was *held,* that

(1) The single justice could determine from the master's findings, with such
material inferences of fact as properly could be drawn, that the strike was for
the purpose of compelling the company to do away with "individual con-
tracts" and to recognize the contentions of the union and, his conclusion not
being plainly wrong, should not be reversed;

(2) A strike for the purpose of compelling the employer to do away with and discontinue such "individual contracts" was unlawful;

(3) If the purpose of the strike was solely to compel the employer to adopt "collective bargaining," it was unlawful;

(4) The strike being illegal, St. 1913, c. 690, was not applicable;

(5) The maintenance by the union of relays of pickets from twenty-five to seventy-five in number patrolling the streets in the vicinity, and at the main entrance of the company's factory calling out at various times the epithets recited in the report, even though not sufficient to frighten or coerce other employees, was unjustifiable;

(6) Such conduct also was intended to be an interference with existing contracts;

(7) It was plain on the entire report that what was done was the outgrowth of concerted action manifested in various forms but all for the single purpose of forcing compliance with the terms of the union;

(8) The granting of injunctive relief was supported by the record and the decree should be affirmed with costs.

BILL IN EQUITY, filed in the Supreme Judicial Court on March 19, 1920, to enjoin the officers, agents and members of the International Association of Machinists, Lodge No. 348, from continuing a strike in the plaintiff's factory and from maintaining and conducting the strike in an unlawful manner.

The suit was referred to a master who filed a report containing, among other findings, the following:

"From the beginning of the strike the union has maintained a patrol of pickets, so called, in the streets in the vicinity of the company's factory, principally near the main entrance. The pickets wear conspicuous badges and are always present, when the employees, who are not on strike, are entering and leaving the works. The number of pickets has varied from about seventy-five to twenty-five. . . .

"The company's factory is a very large one, covering an extensive acreage, and having a number of entrances. The main gate is on Eliot Street, where the largest patrol has been maintained. . . .

"As a general rule the conduct of the pickets has been orderly. The sidewalk has been left clear for the use of employees, and their free passage has not been interfered with. A few assaults have occurred, not at the place where the picketing is maintained, however, but at such a distance and so seldom that they must be regarded, I think, as individual instances and not as incident to or a part of the system of picketing or of the methods adopted by

the strikers or as caused or sanctioned by the union in its conduct of the strike.

"In maintaining their patrol, the pickets walk up and down in the street, generally two abreast. They call out repeatedly 'There is a strike on' — 'Don't forget there is a strike on' — 'There is a big strike on.' In the early part of the strike, but not lately, there were cries of 'This plant unfair to organized labor' and infrequently 'Strike honor' — 'Join us and help win' — 'Don't be yellow.' The calls of the pickets are uttered in an 'out-of-door voice,' louder than is necessary in order to be heard, yet not loud enough to be a breach of the peace, or of itself to constitute disorder. The voices and attitudes of the pickets has at times been hostile, but not habitually so, and here too I find that such instances as have been shown to me of such demeanor have been individual and not a part of the general conduct of the body, or the scheme of the union in conducting the strike, nor have they occurred with such frequency as to charge those in control with responsibility therefor.

"Apart from the ordinary meaning and implication of the words used, and above given, under such circumstances, and the natural influence of the presence of the pickets as a constant reminder of the strike and of a spirit of criticism and some unfriendliness on the part of the strikers toward those who remain at work, I cannot say that in general the conduct of the pickets has been such as to frighten or coerce the other employees. Unless picketing, such as I have described under the circumstances is unlawful, I cannot find as a matter of fact that it was accompanied by injury or threats of injury or by disorder."

Other material portions of the master's report are described in the opinion. The suit was heard by *Pierce*, J., and, exceptions to the report having been waived, the judge confirmed the report and a final decree was entered "that an injunction issue restraining the defendants and each and every of them, their agents, servants and attorneys, from interfering with the plaintiff's business by maintaining or carrying on any conspiracy for the purpose of compelling the plaintiff to withdraw contracts already entered into with individual employees or to cease signing contracts with individual employees; or by persuading, inducing or enticing any persons now or hereafter in the employment of the

plaintiff having contracts of employment with the plaintiff to break the same or to leave the plaintiff's employment; or by persuading, inducing, or enticing any persons seeking to enter into contracts of employment with the plaintiff or desirous of entering into the same from entering into such contracts of employment or working thereunder; or by continuing, maintaining, aiding or abetting in any manner the strike now in force against the plaintiff, either by intimidating, threatening, annoying or hindering any person or persons now or hereafter in the employment of the plaintiff or desirous of entering the same from entering into or remaining therein, or by annoying or interfering with such persons in proceeding to or from their places of abode and said premises or in pursuing their respective ways about the public streets, or by congregating in the vicinity of the plaintiff's premises, or by establishing or maintaining pickets or patrols in the vicinity of the plaintiff's premises, or by acting in any manner calculated to intimidate or annoy the plaintiff's employees or to continue, maintain, aid or abet the strike now in force against the plaintiff."

The defendant appealed.

St. 1913, c. 690, referred to in the opinion is as follows: "No person shall be punished criminally, or held liable or answerable in any action at law or in equity, for persuading or attempting to persuade by printing or otherwise any other person to do anything, or to pursue any line of conduct not unlawful or actionable or in violation of any marital or other legal duty, unless such persuasion or attempt to persuade is accompanied by injury or threat of injury to the person, property, business or occupation of the person persuaded or attempted to be persuaded, or by disorder or other unlawful conduct on the part of the person persuading or attempting to persuade, or is a part of an unlawful or actionable conspiracy."

*H. R. Donaghue & W. G. Thompson*, (*P. J. Donaghue* with them,) for the defendants.

*C. F. Choate, Jr.*, (*Joseph Wentworth* with him,) for the plaintiff.

BRALEY, J.  A strike having been inaugurated at the plaintiff's factory on March 5, 1920, suit is brought against the defendants as the officers, agents and members of the local lodge of the International Association of Machinists, a voluntary organization, asking for injunctive relief from a continuance of the strike and from

its maintenance by unlawful means. We shall hereafter refer to the defendants who hold the offices and exercise the powers described in the second paragraph of the bill as the union, and to the plaintiff as the company.

It appears from the master's report, and the single justice could find, that in November or December, 1919, the company for the purpose of preventing machinists from leaving its employment after they had been trained as skilled workmen at considerable expense, and to retain a force of reliable workmen so that it could enter into and perform contracts for the manufacture and delivery of its product with reasonable assurance of success and dispatch, solicited individual machinists as they were hired to sign a contract, a copy of which is annexed to the report. By these contracts, which are referred to in the record as "individual contracts," the employee to the best of his skill and ability, and in accordance with factory regulations, agreed to work for the company during its regular working hours for one year from the date of employment, at a fixed compensation for each hour worked, or the prevailing piece rate. If at the expiration of the year neither party gave to the other notice in writing of termination, the agreement was to remain in force for the further period of one year.

The company could lawfully contract with machinists who desired to enter its service, and as no law of the land was violated, it could impose as a condition precedent to employment, the terms of the "individual contracts." *Plant* v. *Woods*, 176 Mass. 492, 498, 502. *Folsom Engraving Co.* v. *McNeil*, 235 Mass. 269. And this right is not cut down nor abridged, as the single justice could say, by the master's further finding, "that another motive operating in the minds of officials of the company in desiring to obtain such contracts was that by means thereof the influence of the union would be weakened, and the power of the strike impaired." The means being legitimate, the company could protect itself from the interruption of its business and consequent damage from the action of discontented employees hired in the mass, and controlled at all times in their contractual relations, by the union of which they were members. *W. A. Snow Iron Works, Inc.* v. *Chadwick*, 227 Mass. 382. *Coppage* v. *Kansas*, 236 U. S. 1, 14. *Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U. S. 229. The union also was under no obligation whatever to recognize the

"individual contracts," and its members who had not thus obligated themselves could retire at will from the company's service leaving it to go into the labor market and obtain competent workmen if any could be found. *Smith* v. *Bowen,* 232 Mass. 106. *Folsom Engraving Co.* v. *McNeil,* 235 Mass. 269.

But the defendants as the master states were not satisfied to take this course, or any other action short of organizing and precipitating a strike which should so cripple the industrial powers of the company as to compel it to abandon its policy of selecting and hiring employees whenever and wherever it pleased. The situation very likely was becoming critical as "The contracts were steadily adopted by considerable numbers of the machinists, until on March 5, 1920, two thousand two hundred and twenty-two employees, of a total of about six thousand, had signed."

We now take up the action of the union begun shortly after the company had requested signatures to the "individual contracts." It first protested. It next presented to the company an agreement which provided that none but union men should be employed when available, and shop committees appointed by the union should be recognized by the company as authorized to consider all disputes or grievances arising between members of the union and the company. It would seem almost unnecessary to say that the parties could have mutually agreed to this proposed form of contract. *Smith* v. *Bowen, supra.* But the company on February 7 declined, and insisted on its right to continue to make "individual contracts," and that this form of employment would be followed. The union replied, that it could not agree that its members should sign the "individual contracts," and it would have to "insist on the practice being discontinued." During further negotiations the proposed agreement submitted by the union was withdrawn, but the proposition then submitted demanded "the elimination of the individual contracts as it concerns employees of the machine department," and it would be "absolutely useless to consider this or any other proposition unless we can come to some agreement as to holding in abeyance the making of these (individual) contracts in the meantime," that is, "for six or seven days while the new proposition was being considered by the company, or until a conference with its board of directors could be arranged." The company on the same day received a

letter from the representative of the union which in substance formally withdrew the proposed agreement, and asked that shop committees to represent the workmen be formed by the machinists which should be recognized as their representatives by the company, and that the "individual contracts" should be withdrawn. The union had voted on February 21 to strike, but this action had not been communicated to the company until March 5 when the strike was put in force, which on March 3 had been sanctioned by the grand lodge with which as a subordinate it was affiliated.

It is expressly found that there was no dispute concerning wages, hours of employment, or general conditions of labor. The master reports that the union claimed before him that the strike was called in defence of "collective bargaining," while the plaintiff as alleged in the bill contended that it was ordered to compel the abandonment of the "individual contracts." The question whether the strike was lawful does not depend upon the choice of descriptive words. If the company surrendered to the union it must of necessity give up in the future the "individual contracts" as applied to employees of the machine department, and the demands even in modified form were not limited to "collective bargaining," but included an irrevocable abandonment of the "individual contracts."

The defendant's answer to all the essential allegations of the bill is nothing more than a general denial, and on the master's findings with such material inferences of fact as properly could be drawn, the single justice as shown by the decree could determine, that the strike was for the purpose of compelling the company to do away with "individual contracts," and to recognize the rights of the union as stated by their representative, and, his conclusion not being plainly wrong, should not be reversed. *East Tennessee Land Co.* v. *Leeson,* 183 Mass. 37. *Kennedy* v. *Welch,* 196 Mass. 592, 594. *Folsom* v. *Lewis,* 208 Mass. 336. *Folsom Engraving Co.* v. *McNeil,* 235 Mass. 269.

But if notwithstanding the unequivocal and positive statements to the contrary appearing in the circulars it sent out broadcast, the contention of the union that the strike was solely to compel the company to adopt "collective bargaining," the decree should stand. "Whatever may be the advantages of 'collective bargaining,' it is not bargaining at all, in any just sense, unless it is

voluntary on both sides. The same liberty which enables men to form unions, and through the union to enter into agreements with employers willing to agree, entitles other men to remain independent of the union and other employers to agree with them to employ no man who owes any allegiance or obligation to the union. In the latter case, as in the former, the parties are entitled to be protected by the law in the enjoyment of the benefits of any lawful agreement they may make." *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, 250, 251. It has been uniformly held in principle by this court, "that the employer is as free to make non-membership in a union a condition of employment, as the working man is free to join the union, and that this is a part of the constitutional rights of personal liberty and private property, not to be taken away even by legislation, unless through some proper exercise of the paramount police power." *Plant* v. *Woods,* 176 Mass. 492. *Berry* v. *Donovan,* 188 Mass. 353. *Reynolds* v. *Davis,* 198 Mass. 294. *Folsom* v. *Lewis,* 208 Mass. 336. *Cornellier* v. *Haverhill Shoe Manufacturers' Association,* 221 Mass. 554. *Baush Machine Tool Co.* v. *Hill,* 231 Mass. 30. *W. A. Snow Iron Works, Inc.* v. *Chadwick,* 227 Mass. 382. *Smith* v. *Bowen,* 232 Mass. 106. *Folsom Engraving Co.* v. *McNeil,* 235 Mass. 269.

The strike being illegal, St. 1913, c. 690, is not applicable, and the maintenance by the union of relays of pickets from twenty-five to seventy-five in number, patrolling the streets in the vicinity and at the main entrance of the company's factory calling out at various times the epithets recited in the report, while not sufficient as the master finds to frighten or coerce other employees, was unjustifiable. *Sherry* v. *Perkins,* 147 Mass. 212. The action taken also was intended to be an interference with existing contracts. Before the vote to strike was taken the union appointed committees who were instructed to investigate and report the names of members who had signed existing contracts in order that charges could be preferred against them, and some fifty-nine members who had signed contracts joined the strikers of whom five were in the ranks of the picketers. The circulars which were distributed as we have said directly and indirectly assailed the individual contract system. It is plain on the entire report that what was done was the outgrowth of concerted action manifested in various forms but all for the single purpose of forcing com-

pliance with the terms of the union. *Reynolds* v. *Davis,* 198 Mass. 294. *Folsom* v. *Lewis,* 208 Mass. 336. *Folsom Engraving Co.* v. *McNeil,* 235 Mass. 269.

We are therefore of opinion that the injunctive relief granted is supported by the record, and the decree should be affirmed with costs.

*Ordered accordingly.*