RICE, BARTON AND FALES MACHINE AND IRON FOUNDRY COMPANY *vs.* EDWARD A. WILLARD & others.

Worcester.    September 26, 1922. — October 10, 1922.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & CARROLL, JJ.

*Unlawful Interference.  Strike.  Labor.*

If members and officers of a labor union, with notice that a certain corporation is conducting an "open shop" and that its employees are serving it under the provisions of contracts in writing, indulge in conduct intended by persuasion, by threats, by intimidation or by force on their part to induce employees of the corporation to cease such employment, they may be perpetually enjoined in a suit in equity from a continuation of such conduct although it was in furtherance of a strike originally begun for a lawful purpose.

The provisions of G. L. c. 149, § 24, are not applicable to a strike, originally begun for a lawful purpose but unlawfully conducted.

BILL IN EQUITY, filed in the Superior Court on July 2, 1921, against certain individuals and others designated as officers and members of a voluntary unincorporated association known as International Molders' Union, Local No. 5, to enjoin alleged illegal acts in furtherance of a strike in the plaintiff's plant.

The suit was referred to a master. Material findings in a report and a supplemental report of the master are described in the opinion. The suit was heard upon the pleadings and the master's report by *Sisk*, J., by whose order there was entered a final decree by which the defendants were perpetually enjoined and restrained from interfering with the plaintiff's business by inducing or attempting to induce any person now or hereafter in the employment of the plaintiff to break any contract of employment with the plaintiff; by picketing or patrolling, or causing others to picket

or patrol, the sidewalk or street in front of or in the vicinity of the premises occupied by the plaintiff; or by obstructing or interfering with employees of the plaintiff or persons desirous of entering the plaintiff's employment, in entering or leaving the plaintiff's premises; or by annoying, molesting or interfering with the plaintiff's employees on their way to or from their places of abode and said premises, or in pursuing their respective ways about the public streets; or by intimidating by threats or otherwise any person or persons who now are or may hereafter be in the employment of the plaintiff or desirous of entering the same from entering it or continuing in it; or by any scheme or conspiracy among themselves or with others, organized for the purpose of annoying, hindering, interfering with or preventing any person or persons who now are or hereafter may be in the employment of the plaintiff or desirous of entering the same from entering it or from continuing therein.

The defendants appealed.

G. L. c. 149, § 24, is as follows: "No person shall be punished criminally, or held liable or answerable in any action at law or suit in equity, for persuading or attempting to persuade, by printing or otherwise, any other person to do anything, or to pursue any line of conduct not unlawful or actionable or in violation of any marital or other legal duty, unless such persuasion or attempt to persuade is accompanied by injury or threat of injury to the person, property, business or occupation of the person persuaded or attempted to be persuaded, or by disorder or other unlawful conduct on the part of the person persuading or attempting to persuade, or is a part of an unlawful or actionable conspiracy."

*J. C. Mahoney*, for the defendants.

*D. W. Lincoln*, for the plaintiff.

CROSBY, J. This is a suit in equity by the plaintiff, a corporation engaged in the business of manufacturing paper and pulp machinery, textile machinery, and maintaining an iron and brass foundry in connection therewith, and which employs a large number of persons, a material part of whom are workmen in the foundry (known as molders, core makers and apprentices), against named defendants and the officers and members of a voluntary unincorporated association, known as International Molders' Union, Local No. 5.

All the individual defendants named in the bill, with the exception of Mackay and Pride, are members of the International Molders' Union, Local No. 5, above referred to. The defendant O'Neil is a member and one of the vice-presidents of a national organization known as International Molders' Union. The bill alleges that by means of a strike ordered and maintained by the defendants, they have conspired to injure and ruin the plaintiff's business.

It appears from the report of the master that for about a year and a half before May, 1921, the plaintiff's foundry was operated as an "open shop" and notice to that effect was given to the employees and posted on the foundry clock; that before June, 1921, the plaintiff found it necessary because of business conditions to reduce wages, and the president of the company requested a committee of foundry employees to meet with him for the purpose of arriving at some understanding which would be mutually satisfactory; that several conferences were had without any agreement being reached, and in response to request from the committee it was agreed to wait until it was learned what reduction in wages was made in Boston foundries; that after the Boston foundrymen reduced the wages, the plaintiff established a new scale of wages substantially as follows: "About $\frac{1}{3}$ of its foundry employees receive more than $6.25 a day; $\frac{1}{3}$ receive $6.25 a day; and $\frac{1}{3}$ less than $6.25 a day; none receiving lower than $6 a day. That during the month of May, 1921, the employees of the plaintiff were receiving the above scale of wages."

It also is found that on May 23, 1921, a meeting was held by Local No. 5 at which it was voted to reject the wage scale adopted by the plaintiff, and a vote was passed that a strike should be declared unless the plaintiff would agree to adopt the union "minimum" wage of $6.25 a day; that between the date of this meeting and June 10, 1921, there were several conferences between a shop committee of the union and the officials of the plaintiff, including Barton, the president, and Vedder, vice-president and general manager. At these conferences the shop committee endeavored to persuade Barton to adopt the union minimum wage of $6.25 a day, which he refused to do; he announced at all these conferences that he intended to run an open shop, but offered to discharge all employees worth less than $6.25 a day.

At the conferences the shop committee endeavored to arrange an interview between the defendant O'Neil, one of the vice-presidents of the International Molders' Union, and Barton, to which the latter agreed; at the meeting held on June 8, 1921, Barton informed the committee that he could not talk with O'Neil until Vedder returned from New York. On Friday, June 10, a meeting was held at which the committee endeavored to have Barton confer with O'Neil. Barton informed the committee that he was obliged to go to Boston on important business and for that reason could not confer with O'Neil on that day but would meet him the next day, June 11, at 11 o'clock in the morning. This was agreed to by the committee. Notice of this appointment was conveyed to Anthony J. Prendergast, chairman of the strike committee, and also, by him to O'Neil; later the same day, Vedder met the shop committee and "it was again left that there would be a further conference on Saturday morning between Mr. Barton and Mr. O'Neil." On the afternoon of the same day, June 10, the molders employed in the foundry "struck" at the close of their work, without giving any notice of their intention to do so, and without waiting for the conference between Barton and O'Neil, which was to take place the following day. During the period between June 11 and June 19 inclusive, the foundry was closed. Upon these facts, found by the master and which do not appear to be disputed, the plaintiff contends that the strike was unlawful. There is much force in this contention. The failure, without excuse, of O'Neil, as the representative of the union, to meet Barton and discuss the situation for the purpose of coming to some satisfactory agreement was plainly a breach of good faith.

In the recent case of *Walton Lunch Co.* v. *Kearney*, 236 Mass. 310, it was said at page 313: "It is a plain case of a breach of good faith and of square dealing between man and man by intentionally failing without apparent excuse and without notice to keep an engagement deliberately made for further consultation touching their contractual relations with each other." This language seems to be peculiarly applicable to the case at bar. See *United Shoe Machinery Corp.* v. *Fitzgerald*, 237 Mass. 537, 543.

If, however, we assume without deciding that the strike was instituted for the purpose of securing higher wages and was lawful, it is plain that the final decree was warranted, if not required,

upon the further findings of the master and the rational inferences to be drawn therefrom.

It is apparent that the strike was voted because the minimum wage of $6.25 was not agreed to be paid to the foundrymen. It appears however from the master's report that, at a conference between the shop committee and Barton, he offered to discharge all employees worth less than $6.25 a day, but that this offer was not agreed to by the committee. It cannot be doubted that the employer had a lawful right to discharge any employee for inefficiency, and if the committee had accepted his offer and all employees worth less than $6.25 a day had been discharged, the defendants would have secured a minimum wage of $6.25 a day.

On June 20, the plaintiff's foundry was open for business and men applied for and were given work. On that day and thereafter, men hired by the plaintiff signed contracts of employment for the term of sixty days, at varying rates of wages per hour (copies of the contracts are exhibits and are annexed to and made a part of the master's report). Notice of these contracts was sent to the defendant Johnson, corresponding secretary of the International Molders' Union, Local No. 5, and to other defendants.

The master further found that on the morning of June 20, men approaching the employment office of the plaintiff were stopped by Anthony J. Prendergast and several other striking molders, who advised the men seeking employment in the foundry not to go to work there, with the result that some of the men did not enter the plaintiff's premises to apply for work although they were notified that morning by Barton that he had jobs for all who wished employment; that on and after June 10 pickets performed continuous duty around the premises of the plaintiff and on streets adjacent thereto; that these pickets were either striking molders or members of Local Union No. 5, who volunteered their services, and they were present every day from the time the strike was called and were at the gates of the premises at the opening hour in the morning, at the noon closing hour, and at the closing hour in the afternoon; that on June 20, the day the foundry was reopened, and for a few days thereafter, a large number of molders, members of the union, congregated near the gates of the plant; that there were also policemen present who escorted the workmen on their way home; that at times pickets followed the workmen

who were being escorted by policemen, but did not do anything by act or word to threaten or intimidate the employees so escorted; there was evidence that one of the men who was accompanied by a policeman appeared to be frightened.

The master also made the following findings: On Monday, June 27, one Robbins, an employee, on his way home was stopped by Prendergast and one Sheridan. Prendergast stood in front of him and blocked his way to the gate and told him that "he was not going to work in that shop." Robbins attempted to pass and did pass Prendergast who acted in an angry and threatening manner; and Sheridan swore at him and called him a "scab." The master states that he does not find on this occasion that Robbins was actually intimidated or frightened. On July 7, Robbins was followed through several streets by men whom he had seen on the sidewalk in front of the foundry and one of whom was engaged in picket duty.

Maryan Zaleski, an employee of the plaintiff under contract dated June 21, 1921, was several times spoken to by Prendergast and told not to go to work in the foundry; and there was evidence that he was offered strike benefits if he left his work; that one morning on his way to work, in company with one Supienski, Zaleski was approached by a striker named Pisaka, one of the defendants, who threatened him and told him that he (Zaleski) would get his neck broken if he did not stop work; that he was frightened and intimidated but continued in the employ of the company; that Frank Supienski, who was in the employ of the defendants under a contract dated June 20, 1921, was spoken to by Prendergast on his way to and from work and told not to work in the foundry, that there was a strike on there; that Samuel Sokal, who was working under contract with the plaintiff dated June 20, 1921, on several days was approached by Prendergast and urged to leave the foundry; that on another occasion a man walking with Prendergast threatened him with bodily injury if he did not leave the company's employ; that Sokal was frightened but continued to work as he had a large family to support; that one Fortier while under contract with the plaintiff, on his way to work passed Prendergast and another man and was called a vile name by the latter; that on June 30, 1921, one Merola, while on his way to seek work at the plaintiff's foundry was stopped by Prendergast who urged

him not to go to work and informed him that there was a strike in the foundry, and upon Merola stating that he had to work somewhere, Prendergast told him "to watch out."

The foregoing findings of the master and the proper inferences to be drawn therefrom make it plain that the methods adopted and carried out in conducting the strike were illegal, even if it be assumed that it was lawful in the beginning.

It was equally illegal for the defendants to attempt to induce workmen to break their contracts of employment, either by force and intimidation or by peaceable means of persuasion. Nearly all of the men who were approached by the defendants and urged not to work were under a written contract of employment. Such conduct is clearly unlawful whether it be that of an individual or of a combination of individuals. *Walker* v. *Cronin,* 107 Mass. 555. *Beekman* v. *Marsters,* 195 Mass. 205. *Reynolds* v. *Davis,* 198 Mass. 294. *Folsom* v. *Lewis,* 208 Mass. 336. *United Shoe Machinery Corp.* v. *Fitzgerald,* 237 Mass. 537. *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, 250, 251.

While the contracts in the case at bar provided that the employment should be for a period of sixty days, the action of the defendants in attempting to induce the workmen to break them would have been illegal if the employment had not been for a stated term. *Hitchman Coal & Coke Co.* v. *Mitchell, supra.*

The defendants rely upon St. 1913, c. 690 (now G. L. c. 149, § 24). It is needless to say that there is no act of legislation to which the defendants can lawfully resort for justification in attempting to induce the plaintiff's employees to break their contracts. All attempts so made were after they had received notice of the existence of the contracts. Even if there had been no contracts involved, the record shows that in several instances the plaintiff's employees were subjected to threats, intimidations and annoyances, which were sufficient in themselves to constitute an illegal carrying on of the strike. These acts were calculated in several instances to intimidate the employees. *Sherry* v. *Perkins,* 147 Mass. 212. *Vegelahn* v. *Guntner,* 167 Mass. 92. *Folsom Engraving Co.* v. *McNeil,* 235 Mass. 269, and cases cited. *Truax* v. *Corrigan,* 257 U. S. 312.

The strike was also illegal because of unlawful picketing accompanied by attempts made to persuade the employees to break

their contracts, and because of intimidation practised upon them. *Martineau v. Foley*, 231 Mass. 220. *United Shoe Machinery Corp. v. Fitzgerald, supra. American Steel Foundries v. Tri-City Central Trades Council*, 257 U. S. 184. In the case last cited it is said: "All information tendered, all arguments advanced and all persuasion used under such circumstances were intimidation. They could not be otherwise. It is idle to talk of peaceful communication in such a place and under such conditions. The numbers of the pickets in the groups constituted intimidation. The name 'picket' indicated a militant purpose, inconsistent with peaceful persuasion. The crowds they drew made the passage of the employees to and from the place of work, one of running the gauntlet. Persuasion or communication attempted in such a presence and under such conditions was anything but peaceable and lawful. . . . Our conclusion is that picketing thus instituted is unlawful and can not be peaceable and may be properly enjoined by the specific term because its meaning is clearly understood in the sphere of the controversy by those who are parties to it. We are supported in that view by many well reasoned authorities, although there has been contrariety of view."

G. L. c. 149, § 24, relied on by the defendants is not applicable. It applies only to a lawful strike lawfully conducted. *Martineau v. Foley, supra. Folsom Engraving Co. v. McNeil, supra.*

Upon the findings of the master, the decree entered in the Superior Court was warranted and must be affirmed.

*Ordered accordingly.*