MOORE DROP FORGING COMPANY *vs.* DANIEL C. McCARTHY & others.

Hampden.    December 7, 1922. — January 9, 1923.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & CARROLL, JJ.

*Labor Union. Strike. Unlawful Interference. Contract,* Validity. *Equity Jurisdiction,* Plaintiff must come into court with clean hands.

If the skilled employees of a manufacturer are members of a labor union and the manufacturer has entered into no agreement nor understanding to employ union labor only he has a right to require as a condition of employment that his employees shall not be nor remain members of a labor union and he is entitled in a suit in equity to be protected in that right by the law and to receive whatever benefits may accrue from such a contract.

A manufacturer, who has exercised his right to require as a condition of employment that his employees shall not be nor remain members of a labor union, may maintain a suit in equity to enjoin conduct of the officers and members

of the labor union, which followed the termination of a strike of employees affected by the enforcement of that condition and which interfered with his business for the unlawful purpose of compelling him to abandon the making of individual contracts with his employees.

A mere failure by a manufacturer in the course of a labor dispute concerning wages to keep an appointment with his employees, which failure is not shown to have been intentional or in the exercise of bad faith, does not call for an application of the maxim that a plaintiff must come into court with clean hands and does not as a matter of law preclude him from maintaining a suit in equity against the officers and members of a labor union to restrain them from interfering with his business for the purpose of forcing him to abandon a system of individual employment contracts.

BILL IN EQUITY, filed in the Supreme Judicial Court on April 18, 1922, to enjoin the officers, agents and members of the Springfield Central Labor Union from interfering with the business of the plaintiff and for further relief.

The suit was referred to a master, who filed a report containing findings, material portions of which are described in the opinion.

The letters written by the individual contract committee of the labor union on February 7, 1922, and May 2, 1922, set out in the master's report and referred to in the opinion, were respectively as follows:

"We wish to call your attention to the fact, that the Moore Drop-Forging Co. of Springfield, Mass., is operating its plant under a closed Non-Union Policy and forces its workers to sign a pledge not to join a Labor Union. Fourteen Months ago, the Drop-Forgers, Polishers, Machinists and Engineers and firemen in this plant were called into the office individually and told that they must give up their Union Cards, and sign an Individual Contract with the Company or get out. The men refused to bind themselves in such a way and the shop was changed almost overnight from a one hundred per cent Union Shop to a one hundred per cent non-union shop. All efforts to negotiate or compromise were refused by the employers and the present time finds conditions unchanged. The men have been on the streets for fourteen months, and the Company has succeeded, by the expenditure of hundreds of thousands of dollars, in recruiting a full crew of workers, pledged by the Individual Contract not to join a Labor Union.

This Individual Contract Policy is assuredly the most deadly menace ever devised by the devilish ingenuity of unscrupulous

employers to utterly destroy the Trades Union Movement. Its success and spread will mean the total destruction of all Trades Unions and you can never be sure that your city may not be picked for the next victim. It is absolutely essential to the life of Organized Labor that this system be met and fought with all the power and resources of the Labor Movement. The courts have restrained the organization from picketing the plant or interfering with the business of the Moore Drop Forging Company. This plant is doing work for Ford, Dodge Bros., Sullivan Machine Company, of Claremont, New Hampshire, and also makes a Stilson Wrench with the trade mark 'Morco' and a circle within M inside (M). Write in to this plant of your own accord, stating your opinion of their policy and defining your stand in regard to the purchase and use of the goods manufactured by them. Will you take this matter up with the Organization in your city and inform us as to what action you have taken upon the information herein supplied. What is your precedure when Employers in your city adopt this Unfair Policy?

Fraternally yours,

(Signed) John F. Gatelee,

Chairman Individual Contract Committee.

This letter is endorsed by the Springfield Central Labor Union.

Daniel MacCarthy                        Harry A. Russell,
President Springfield C. L. U.        Sec'y Springfield C. L. U."

"Dear Sir and Bro:

We wish to call your attention to the fact that the Moore Drop Forging Company of Springfield, Massachusetts, is operating its plant under a policy which compels all employees to sign an Individual Contract repudiating all Union affiliations. After twenty years of the most friendly relations with Organized Labor, the fair policy of this plant was suddenly reversed and became, almost over-night, a bitter enemy of the Trades Union Movement.

Our members have been on strike for sixteen months, and are as determined to-day as they were at the start, to stay out against this unfair system. By the expenditure of thousands of dollars, and by the restraining action of the Courts, they have succeeded in tying our hands.

They manufacture Stilson Wrenches bearing the trade mark MORCO and a (M) inside a circle. These wrenches are sold all over the United States and even in Europe. They also make small parts for Ford, Dodge and Franklin automobiles. We suggest that you investigate, to learn if the wrenches are on sale in your city.

Anything your Organization can do to help us fight this non-union shop system will be greatly appreciated. If this system should become firmly established it would mean the absolute extermination of the Trades Union Movement. The danger is pressing. Write to this plant, telling them of your opinion of their policy. It is our purpose to create by legitimate means public sentiment against this system of employment.

Hoping to hear from you on this matter, we are

Fraternally yours,

(Signed) John F. Gatelee, Chairman
Individual Contract Committee of
Springfield Central Labor Union."

The defendants filed the following objections and exceptions to the master's report:

" 1. Because the master fails to find that the thirty days' notice given by Mr. Fuller on October 11, 1920, was revoked by him.

" 2. Because the master fails to find that during the month of November and forepart of December, the individual contract system was worked out at the plaintiff's plant and the men were not informed by it.

" 3. Because the master does not expressly find that at the time the individual contract was presented to the men a valid working schedule agreement was in existence and force between the plaintiff and its employees.

" 4. Because the master does not find that the defendants have not tried to compel the plaintiff to maintain a closed shop where only union labor could be employed.

" 5. Because the master makes no finding as to the plaintiff being a member of the Metal Trades Association of Springfield.

" 6. Because the master finds that in August, 1921, the plaintiff's business was being operated in a normal and usual manner

and makes no finding as to whether or not the labor controversy which arose December 9, 1920, had been adjusted."

The suit was heard by *De Courcy*, J., by whose order there were entered an interlocutory decree overruling the defendants' exceptions and confirming the master's report and a final decree enjoining and restraining perpetually certain named defendants, "and the officers and members of the Springfield Central Labor Union, their agents, servants and attorneys, and all persons acting in aid of or in conjunction with them, from interfering or attempting to interfere with the business of the plaintiff.

"1. By inducing or persuading, or attempting to induce or persuade any person now or hereafter in the employment of the plaintiff to leave the plaintiff's employment; or by preventing or attempting to prevent persons intending to enter the employment from doing so; or by any unlawful means preventing or seeking to prevent the plaintiff from entering into individual contracts with its employees;

"2. Or by persuading, inducing or coercing any person from patronizing the plaintiff or using or dealing in the plaintiff's products; or by inducing or attempting to induce any person now or hereafter under contract with the plaintiff to break said contract;

"3. Or by parading at or near the plaintiff's plant with signs, wagons or trucks for the purpose of interfering with or annoying or disturbing the plaintiff's employees."

The plaintiff and the defendants appealed from the final decree. The case was submitted on briefs.

*G. F. Leary, G. D. Cummings & G. F. Palmer,* for the defendants.
*H. A. Baker,* for the plaintiff.

CROSBY, J. This is a bill to restrain certain defendants as individuals, and the officers and members of the Springfield Central Labor Union, their agents, servants and attorneys, and all persons acting in aid of or in conjunction with them, from interfering or attempting to interfere with the business of the plaintiff. The case was referred to a master who filed a report, and an interlocutory decree has been entered overruling the defendants' exceptions thereto, and confirming the report; no appeal was taken from this decree, and a final decree has been entered from which both the plaintiff and the defendants appealed.

The master found that in October, 1920, the plaintiff notified

its employees that owing to business conditions they would be asked to accept a reduction in wages of ten per cent; that while all the plaintiff's skilled employees were union men, there was no understanding or agreement between them and the plaintiff that only union men should be employed; that the plaintiff's plant was not a closed shop in the sense that only members of a union could be employed. The question of the acceptance of the reduction of wages was discussed at a meeting of the four crafts involved, and it was voted to refuse to accept the proposed reduction; and on October 11, 1920, the plaintiff was notified to that effect. The plaintiff's general manager, Fuller, thereupon stated to the committee that thirty days from that date all agreements between the plaintiff and any and all unions would cease. The only union which then had a working agreement with the plaintiff was the blacksmiths and drop forgers union; that agreement provided for a thirty-day notice in the event of the desire of either party to cancel the same.

The master found as to the other unions that while there was no working agreement, there was an understanding on the part of the men, recognized by Fuller, that the men were entitled to a notice of thirty days of a change or cancellation of the terms or conditions under which they were then employed.

On October 20, 1920, Fuller, at the request of a representative of the unions met a committee representing the four crafts for the purpose of discussing with them the "elimination of waste," and ways and means of reducing the cost of production; it being thought by both parties that if such cost could be decreased, the reduction in wages could be avoided; at this meeting Fuller intimated that the employees place their suggestions in writing and meet him again on October 27, when they would be considered; the committee prepared some written suggestions and were ready to meet him on October 27, but on that date they were notified that he was in Detroit and would not be able to meet them until later; he did not meet them on the subsequent date and did not attempt to do so afterwards. The thirty-day notice given by the plaintiff's manager expired November 11, but the men continued to work under the same conditions of employment and at the same rates of wages until December 9, 1920.

The master found that Fuller did not at any time state to

any person that the thirty-day notice was withdrawn or revoked, but that the committee were led to believe by him and did believe, that if the question of wages, which was the only matter under discussion, could be disposed of, the employees would be allowed to continue in their employment under the terms and conditions then existing.

For several months the business of the plaintiff had decreased; owing to the general business depression the number of its employees had been reduced, and on December 9, 1920, all employees were requested to sign an application for employment which recited in part as follows: That employment was "upon a strictly non-union basis and I agree that while retained in employment I will not be or become a member of any trade union. That if I hereafter apply for membership in any trade union I will at once notify my employer, who may thereupon terminate my employment. That upon termination of my employment for any reason I will not in any manner annoy, molest or interfere with the business, customers or employees of said employer." The master found that the plaintiff did not intend to continue in its employ any employee who refused to sign this contract, and that this fact was known to the employees at the time. Fifty-eight men refused to sign the contract and were discharged on December 11. One hundred and twenty men who had signed left their work. "From December 11 to January 10, the four unions, represented by a committee, called the joint committee, engaged in various activities against the plaintiff for the purpose of compelling it to abolish its newly established system of employment and to return to the former working conditions with its former employees. On January 10, 1921, the plaintiff brought a bill in equity in this court to restrain the unions from carrying on certain activities alleged to be unlawful. This proceeding resulted in the stipulation entered into by both parties and on file in this court." It was also found that strike benefits have not been paid since the middle of December, 1921, and that with a few exceptions all the men who left the plaintiff's employ have secured employment elsewhere; that the plaintiff's business in August, 1921, was being operated in a normal and usual manner and to a normal and usual extent, and the places of all the union men who had left its employ were filled.

The master further found that in January, 1919, the Central Labor Union, for the purpose of combating the individual contract system of employment, appointed a committee to study the system and to devise means of preventing its extension. In January, 1922, the individual contract committee was reorganized with the defendant Gatelee as its chairman; others of the defendants were members of the committee. The committee at once entered upon an active campaign against the system, and letters against it from the chairman of the committee were published in a local newspaper; these publications continued up to the time of the filing of the bill. On February 7, 1922, a letter was mailed to some five hundred central labor unions in the United States, Great Britain and Canada. A copy of this letter is embodied in the master's report. It also appeared that many public meetings were held at the instigation of the committee, which caused a covered wagon with printed signs on it to be driven past the plaintiff's plant daily for five days; and in April, 1922, the chairman of the committee produced a moving picture camera, and attempted to take pictures of employees of the plant as they were leaving their work, which incensed and disturbed them; during the same month the committee procured an automobile truck on which was displayed a sign which recited in substance that there was plenty of work for drop forgers, die sinkers and trimmer die makers in various named cities in the United States and in Canada. On May 2, 1922, after this bill was filed, a letter was sent by the committee to some four hundred electrical workers' unions; a copy of this letter is also printed in the master's report.

The master, upon all the evidence, made certain findings including the following: "Third. That the Individual Contract Committee of the Central Labor Union about January 1, 1922, undertook to carry on a general campaign against the 'continuation and spread' of the Individual Contract as a system of employment, and in carrying on its said campaign against the continuance of this system of employment did by its acts and doings intentionally attempt to interfere with the plaintiff and its business by endeavoring to influence persons not to use its goods and by acts which annoyed and disturbed its employees, and that said acts and doings of said committee were calculated and intended to injure the plaintiff in the sale of its products and

to cause plaintiff's employees to leave its employ, and if continued are likely to result in substantial damage to this plaintiff."

Upon the subsidiary findings made by the master and recited in his report, it is plain that the third finding was warranted. We are of opinion that in view of that finding, when considered in connection with the other findings, the final decree entered by the single justice was justified.

It is obvious that the acts of the committee were for the purpose of endeavoring to influence persons not to use the plaintiff's goods; they were calculated to annoy and disturb its employees, and were intended to injure the plaintiff in the sale of its products, and to cause its workmen to leave its employ to its substantial damage. The contention of the defendants that the acts of the committee were in the furtherance of an educational campaign against the individual contract form of employment, and were not directed against the plaintiff, cannot be sustained in the light of the facts as found by the master.

The plaintiff was entitled to make it a condition that those entering its employment should not be nor remain members of a labor union, and is entitled to be protected by the law and to receive whatever benefits may accrue from such a contract. *United Shoe Machinery Corp.* v. *Fitzgerald*, 237 Mass. 537. The right of one to have the benefit of his contract is a right which can lawfully be interfered with only by one who is acting in the exercise of an equal or superior right which comes in conflict with the other. *Berry* v. *Donovan*, 188 Mass. 353. *Folsom* v. *Lewis*, 208 Mass. 336.

The finding that in August, 1921, the plaintiff's business was operated in a normal and usual manner and to a normal extent, and that the places of all the union men who had left the plaintiff's employ had been filled, and that strike benefits had not been paid since December, 1921, plainly shows that the strike was over at that time. G. L. c. 150, § 4. *M. Steinert & Sons Co.* v. *Tagen*, 207 Mass. 394. *Commonwealth* v. *Libbey*, 216 Mass. 356. *Quinlivan* v. *Dail-Overland Co.* 274 Fed. Rep. 56.

But if the strike was still pending, the members of the Central Labor Union had no right to interfere with the plaintiff's business for the illegal purpose of forcing it to abandon the making of individual contracts with its employees. *Reynolds* v. *Davis,*

198 Mass. 294.   *Folsom Engraving Co.* v. *McNeil,* 235 Mass. 269.   *Rice, Barton & Fales Machine & Iron Foundry Co.* v. *Willard,* 242 Mass. 566.

The findings of the master were that the individual contract committee by its acts intentionally attempted to interfere with the plaintiff in its business, that such acts were calculated to injure the plaintiff in the sale of its products, and were without lawful justification; the acts above recited were in substance a boycott and illegal.   *Burnham* v. *Dowd,* 217 Mass. 351.   *Harvey* v. *Chapman,* 226 Mass. 191.   *Godin* v. *Niebuhr,* 236 Mass. 350.   *Gompers* v. *Bucks Stove & Range Co.* 221 U. S. 418.

The defendants contend that the plaintiff is not entitled to relief in equity, for the reason that it fraudulently failed to carry out the agreements made by it with the defendants respecting notice, before the working agreements could be terminated; and because Fuller, the plaintiff's manager, failed to meet the committee as agreed on October 27, 1920, for the purpose of considering the question whether the cost of production could be reduced.   As to the first of these contentions, the master expressly found that the plaintiff's manager (who gave notice to the committee on October 11, that all agreements would be terminated in thirty days from date) did not at any time state to any person that the notice in question was withdrawn or revoked; but that the committee was led to believe by Fuller and did believe that the matter of wages, which was the only subject then under discussion, could be disposed of and the plaintiff's employees would be allowed to continue their employment under the terms and conditions then in effect.   This finding makes it plain that the notice originally given was not at any time withdrawn or revoked, nor were the defendants justified in believing that it would be revoked or withdrawn unless an amicable settlement of the disputed question of wages was reached.   Accordingly when the period of the notice expired on November 11, the agreement ceased to exist, although the employees continued to work for nearly a month thereafter at the same wages they had previously received.

The circumstance that the plaintiff's manager failed to meet the committee as agreed on October 27, falls far short of showing that his absence was intentional, and that he did not propose

to keep the appointment in good faith. The committee were notified. that he was in Detroit on that day and would not be able to meet the committee until a later date; he returned about November 1, thereafter, but did not make any attempt to meet the committee, nor does it appear that the latter ever made any effort to confer with him. The case of *Walton Lunch Co.* v. *Kearney,* 236 Mass. 310, is plainly distinguishable from the present case. See *Rice, Barton & Fales Machine & Iron Foundry Co.* v. *Willard, supra.*

The acts complained of, committed by the Central Labor Union, were entirely apart and distinct from the controversy which in December, 1920, had arisen between the plaintiff and its employees; that controversy related to wages and resulted in a strike which on the findings of the master ended in August, 1921. The present suit is brought to prevent unjustifiable interference with the plaintiff's employees and with its business. In these circumstances, even if the plaintiff had failed to give due notice before terminating the working agreements, or had intentionally refused to meet the committee as its general manager had agreed, the rule that a plaintiff must come into court with clean hands to be entitled to relief in equity is not applicable to the facts in the present case. The acts now complained of have no direct relation to the original controversy. The plaintiff does not ask for relief arising from any contract or transaction tainted with fraud or bad faith. *Lufkin* v. *Jakeman,* 188 Mass. 528. *Beekman* v. *Marsters,* 195 Mass. 205. *Lurie* v. *Pinanski,* 215 Mass. 229. *Warfield* v. *Adams,* 215 Mass. 506.

The final decree was warranted by the findings of the master and is sufficient in its terms to protect the rights of the plaintiff. It follows that neither the plaintiff's nor the defendants' appeal can be sustained.

*Decree affirmed.*