KEITH THEATRE INC. *vs*. WILBUR J. VACHON, ET ALS.

Cumberland.     Opinion, September 24, 1936.

*Jacob H. Berman,*
*Julius Greenstein,* for plaintiff.
*Leo J. Mahoney,*
*Walter M. Tapley, Jr.,* for defendants.

394

SITTING: DUNN, C. J., STURGIS, BARNES, HUDSON, MANSER, JJ.

HUDSON, J. The plaintiff, lessee and operator of Keith's Theatre in the City of Portland, complains in equity against eight men of Portland, two men of South Portland (all union officials), three local unions, to wit, Local No. 458 of the International Alliance of Theatre Stage Employees and Moving Picture Machine Operators of the United States and Canada, The Portland Stage Employees Union No. 114, and the American Federation of Labor of Musicians Local Union No. 364 (voluntary and unincorporated labor organizations in Portland), and seeks injunctive relief from the picketing of its theatre by the defendants, their agents and servants. Hearing upon bill, answer and replication was had before a single Justice of this Court, who refused to issue an injunction. The case now is before us on appeal and exceptions, the plaintiff excepting to the rulings of law as made by the presiding Justice and appealing from his decision. The appeal and exceptions permit of one discussion.

The evidence as presented is not before us for the reason that the plaintiff is content to accept "the Court's findings of facts . . . ."

These findings may be thus summarized:

1. When the plaintiff started to operate its theatre, conferences were held with union representatives at which were discussed the adoption of the union wage schedule and operation of the theatre as a "closed shop" but no agreement for either was made.

2. The plaintiff conducted its theatre as an "open shop."

3. The wages it paid were materially lower than those of the union schedule, while the latter were considerably higher than the manager said the plaintiff could "afford to pay and live."

4. The plaintiff's employees were entirely satisfied with the wages they received. They neither struck nor picketed. They had no grievance against the plaintiff.

5. While the plaintiff did not have in its employment members of any unions, yet it did not refuse to employ union help. It would not consent, however, to employ only union laborers.

6. The picketing complained of commenced in August, 1935, and the Court found that it was "for the sole purpose of compelling the

plaintiff to adopt the so-called closed shop agreement and the union schedule of wages."

7. The picketing consisted mostly of walking "back and forth in front of the theatre with signs on which was printd a statement to the effect that Keith's Theatre is unfair to organized labor, that it does not employ union stage hands, musicians and operators, and urging the public not to patronize the house." For a time the same sentiments were expressed by word of mouth. It also is conceded that the musicians' union passed a vote fining any of its members $10.00 who attended the theatre, and that this fine was imposed in at least two cases.

8. The single Justice stated "with the exception of the action of the musicians' union, which involved only its own members, I find no evidence of any boycott, any threat, any intimidation of either the public or employees. The activities of the pickets have been an annoyance; but the pickets have not accosted patrons or employees; and their actions have not resulted in the collection of any crowds, which have blocked the entrances of the theatre or the approaches thereto. When they have talked in too loud a voice, they have stopped on being admonished. The evidence indicates that the public has paid very little attention to them; and there is nothing to show what, if any, effect their efforts have had in reducing the patronage of the theatre."

Having thus found the facts, the Justice then said: "The problem in this case resolves itself into the simple issue whether the picketing of this theatre by these defendants as carried on should be restrained. An injunction should be granted, if, first, the end sought to be gained is unlawful, or, second, if the means used are oppressive" and then held that the end sought was lawful and the means employed not oppressive, to both of which rulings the plaintiff excepted and from the decision based on such rulings it appealed.

In this State we have been remarkably free from labor conflicts which might foment strikes, boycotts and picketing. Common sense, control of temper and application of the Golden Rule upon the part of both employers and employees have made possible peaceable adjustments of their difficulties, so that until now this Court

has never had occasion to consider or discuss the use of the injunction in labor disputes. From other state, as well as federal courts, have come down many able opinions, displaying much lack of unanimity in labor law. This Court, then, both unaided and unhampered by prior Maine decisions, but well served by the reasoning of other courts, is free to declare as law herein that which it considers best calculated in accordance with legal principles to effect justice.

Many of the older opinions dealt with questions about which now there seems to be no particular controversy. Not many years ago it was claimed that labor unions were illegal and the Court of Queen's Bench, in the case of *Hornby* v. *Close* (1867) 2 L. R. 2 Q. B. 153, decided that a trade union was illegal, even, though it existed only to secure higher wages and shorter working hours, because it was in restraint of trade. This continued to be the law in England until changed by an Act of Parliament in 1871. In this country, the courts have held fairly uniformly that labor unions "when instituted for mutual help carrying out their legitimate objects" are lawful organizations. *Yates Hotel Co., Inc.* v. *Meyers, et al.*, 195 N. Y. S., 558; *American Steel Foundries* v. *Tri-City Central Trade Union, et al.*, 257 U. S., 184.

A trade union or labor organization has been defined to be "a combination of workmen usually (but not necessarily) of the same trade, or of several allied trades, for the purpose of securing by united action the most favorable conditions as regards wages, hours of labor, etc., for its members." *Stone* v. *Textile Examiners and Shrinkers Employers' Association*, 122 N. Y. S., 460.

> "Workingmen may combine for their mutual benefit and protection and to improve their economic and social condition, including the improvement of working conditions, the obtaining of such wages as they choose to demand, and the establishment of a standard of wages throughout the country, without incurring either criminal or civil liability, even though they know that their action will necessarily cause loss to their employers, or to other persons." Oakes, Organized Labor and Industrial Conflicts, Sec. 3, and cases cited thereunder.

The performance of work is vitally necessary to existence. Usually it is a matter of contract between employer and employee.

Without question, fair and just compensation should always be paid for the work performed. The ideal contract is one in which the parties are able to determine and agree upon a wage that shall fairly and justly compensate the employee.

But the contracting parties are not always in exact equality in education and experience, influence and mentality, so that one of them may not have an advantage over the other in the making of the contract. Freedom to contract plays an important part. One who has no choice but must work at whatever wage he can obtain is an easy prey for an unfair and unjust employer.

Thus inequality of position between the employer (and often it is a corporation of vast power) and a single employee, is sufficient justification for the creation of trade unions.

Work being necessary, the labor market should be as free as possible, both to employer and employee.

". . . The right freely to contract with one's fellow-men without interference other than may arise from the exercise by others of some equal or superior right" should be granted in a free labor market. Oakes, *supra*, page 406.

"The right to the free flow of labor is not an absolute right; it is limited by the right of employees to combine for purposes which in the eye of the law justify interference with the plaintiff's right to a free flow of labor. A combination which interferes with a plaintiff's right to a free flow of labor is legal if the purpose for which it is made justifies the interference with that right. On the other hand it is illegal if that purpose does not justify the interference (which ensues from the making and enforcing of the combination in question) with the plaintiff's right to a free flow of labor." *Haverhill Strand Theatre, Inc.* v. *Gillin, et als.*, 229 Mass., 413, 118 N. E., 671, 673.

A strike has been defined to be "a combined effort among workmen to compel the master to the concession of a certain demand, by preventing the conduct of his business until compliance with the demand." *Farmers Loan & Trust Co.* v. *Northern Pac. R. Co., et al.*, 60 Fed., 803, 821.

A strike may be legal or not, depending upon its purpose.

"Whether the purpose for which a strike is instituted is or is not a legal justification for it, is a question of law to be decided by the Court. To justify interference with the rights of others the strikers must in good faith strike for a purpose which the Court decides to be a legal justification for such interference. To make a strike a legal strike it is necessary that the strikers should have acted in good faith in striking for a purpose which the Court holds to have been a legal purpose for a strike." *De Minico* v. *Craig, et als.*, 207 Mass., 593, 598, 94 N. E., 317, 319.

A strike necessarily assumes the existence of a grievance. To right the asserted wrong is its purpose. No one is known ever to have struck because his wage is too high or his work day too short. Only such strikes as are called for the purpose of obtaining that which is lawful are lawful strikes. Strikes to accomplish certain ends are lawful, although they hamper the employer and put him to financial loss. While out on strike it is not considered that the strikers have abandoned their employment but rather have only ceased from their labor.

"Neither strike nor lockout completely terminates, when this is its purpose, the relationship between the parties. The employees who remain to take part in the strike or weather the lockout do so that they may be ready to go to work again on terms to which they shall agree,—the employer remaining ready to take them back on terms to which he shall agree. Manifestly, then, pending a strike or a lockout, and as to those who have not finally and in good faith abandoned it, a relationship exists between employer and employee that is neither that of the general relation of employer and employee, nor again that of employer looking among strangers for employees, or employees seeking from strangers employment." *Iron Moulders' Union* v. *Allis-Chalmers Co.*, 166 Fed., 45, 52.

As the free flow of labor is subject to interruption by a lawful strike, so is it by picketing by employees if they refrain from threats, coercion, intimidation, force and violence. A controversy having arisen between the employer and its employees, whether it

has resulted in cessation of labor or not, that to be accomplished is to end the dispute either by a resumption of their former contractual relationship or, if that be impossible, by an accepted modification of it. The end sought is reconciliation. Strikes and picketing are simply means to that end.

"It is the right of every man, unless bound by contract to serve for a definite period, to leave at any time an employment which for any reason is distasteful to him; and this right is as perfect and complete as the correlative right of all men to seek employment wherever they can find it. . . . A strike is not therefore, in itself an unlawful act, even though its effect is to cause loss to the employer. The legality or illegality of a strike depends, first, upon the purpose for which it is maintained, and, second, upon the means employed in carrying it on. The fact that the combination is for a lawful purpose does not render it less unlawful where the end is to be attained by the employment of improper means, and a strike for an unlawful purpose may not be carried on by means that otherwise would be legal." Oakes, *supra*, Sec. 312, page 419.

With these general observations we come now to the case at bar. The Justice held that the end sought by this picketing was lawful. As to what that end was is not in dispute, for it is conceded that it had a twofold purpose, first, to compel the plaintiff to adopt to so-called "closed shop" agreement, and, second, to adopt the union schedule of wages.

"Without question a strike for both a legal and an illegal purpose is an illegal strike . . . ." *Baush Machine Tool Co.* v. *Hill, et als.*, 231 Mass., 30, 36, 120 N. E., 188.

Then, were both of these purposes lawful? Unquestionably employees have a lawful right to strike to obtain an increase in wages and we think so even though as increased they are on a level with the union schedule.

The other and no doubt the principal purpose inducing this picketing was to compel the plaintiff "to adopt the so-called closed shop agreement." Was this a lawful purpose justifying even peaceable picketing by the defendants? Here it becomes necessary to call

particular attention to the fact that this picketing was not done by the plaintiff's employees, who were entirely satisfied with their employment still pursued, but by agents and servants of the defendant unions who had no contract nor relationship, direct or indirect, either with the plaintiff or the plaintiff's employees. Had there been a grievance and had a strike by the plaintiff's employees resulted from it, even if it were held that they could picket peaceably *to secure unionization for their own benefit, non constat* that these defendants, their agents and servants, could picket though peaceably. While we need not go so far in this case as to hold that the employees themselves could not picket peaceably or strike to secure unionization, yet there is much eminent authority to that effect.

> "Strikes to secure recognition of the union, to force discharge of non-union men, or to effect a closed shop have been held illegal. *Plant* v. *Woods*, 176 Mass., 492, 57 N. E., 1011; *Berry* v. *Donovan*, supra; *Folsom* v. *Lewis*, 208 Mass., 336, 94 N. E., 316; *W. A. Snow Iron Works, Inc.* v. *Chadwick*, 227 Mass., 382, 388, 389, 116 N. E., 801; *Baush Machine Tool Co.* v. *Hill*, supra; *Folsom Engraving Co.* v. *McNeil*, 235 Mass., 269, 276, 277, 126 N. E., 479; *Moore Drop Forging Co.* v. *McCarthy*, 243 Mass., 554, 137 N. E., 919." *Stearns Lumber Co.* v. *Howlett, et als.*, 260 Mass., 45, 60, 61, 157 N. E., 82, 87.

> "The question whether the closed shop is a legitimate subject of industrial dispute is one of considerable difficulty. In the majority of cases it has been held that, on account of its tendency to give union labor a monopoly, it is not a legitimate aim." Oakes, *supra,* Sec. 292, page 392.

Many cases pro and con are collated in Oakes, *supra,* and appear in footnotes 71, 72 and 73 to Section 292, on pages 392 to 397 inclusive.

In *Sarros, et al.* v. *Nouris, et al.*, 138 Atl., 607, (Del.), the Court said:

> "The real object of the strike being as I have said to compel the complainants to unionize their business by subjecting it to control and domination by the labor organization, an object

which the law does not recognize as legitimate, the complainants are entitled to protection against the continued picketing of their place of business by the defendants or their agents. If it is lawful for the defendants to destroy a part of the complainant's business by the picketing and its incidental boycott, it would be lawful for them if possible to destroy in toto. As I read the authorities, their weight is to the effect that such calamitous consequences can not be visited upon the complainants as punishment for their refusal to surrender the right which is theirs to employ non-union labor if they choose. This being true, the picketing which has been going on is unlawful, whether peaceful or otherwise. I am not, therefore, called upon to go into the question of whether picketing if peacefully conducted is permissible in labor controversies, for if the object of the picketers is unlawful, picketing of all kinds is likewise so."

Also, *Elkind & Sons Inc. et al.* v. *Retail Clerks' International Protective Assn., et al.*, 169 Atl., 494; *George Jonas Glass Co.* v. *Glass Blowers' Assn., et al.*, 79 Atl., 262; *Hughes et al.* v. *Kansas City Motion Picture Machine Operators, et als.*, 221 S. W., 95 (Mo.); *Goldberg, Bowen & Co.* v. *Stablemen's Union*, 86 Pac., 806 (Cal.); *Pierce* v. *Stablemen's Union*, 103 Pac., 324 (Cal.); *McMichael* v. *Atlanta Envelope Co.*, 151 Ga., 776, 108 S. E., 226; *Levy & Devaney, Inc.* v. *International Pocket Book Workers' Union*, 158 Atl., 796; *Sterling Chain Theatres, Inc.* v. *Central Labor Council*, 155 Wash., 217, 283 Pac., 1081; *St. Germain et ux.* v. *Bakery, etc. Union*, 97 Wash., 282, 166 Pac., 665; *Music Hall Theatre* v. *Motion Picture Machine Operators, et al.*, 249 Ky., 639, 61 S. W. (2nd), 283; *Jefferson & Indiana Coal Co.* v. *Marks*, 287 Penna., 171, 134 Atl., 430; *Citizens' Co.* v. *Asheville Typographical Union*, 187 N. C., 42, 121 S. E., 31; *Lehigh Structural Steel Co.* v. *Atlantic Smelting & Ref. Works*, 111 Atl., 376 (N. J.).

In an article in the Yale Law Journal, entitled "Labor and the Courts" (Vol. 39, page 683, on page 696, it is stated:

"Courts are hopelessly divided as to whether a strike to unionize a shop or in pursuance thereof to compel the discharge of a non-union employee is legal or illegal. New York,

Illinois, California, Minnesota, and a substantial group of other states hold such a strike legal. But there are important states, such as Massachusetts, Pennsylvania, and New Jersey, which hold the strike to unionize a shop illegal. The holding of such a strike illegal seems manifestly unjust. Under the existing law it is clear that employers have the unquestioned right, · acting singly or in association, to discharge employees because they belong to a union. If the employers have this right, why should the employees not possess an exactly similar right, acting singly or in association, to cease working for an employer because he runs a non-union shop? In other words, employees should be as free to strike as the employer is free, under the existing law, to discharge, in order to accomplish the unionization or the de-unionization of a shop, trade, or industry."

What would appear to be the fallacy in the above reasoning, it would seem, is that equality results. It seems to us that it does not, for the employee upon his discharge may work for whomsoever he chooses, while the employer after compulsory unionization is restricted to the employment of only union help. Besides, the employer has an established business which should have the right of continued existence, if conducted lawfully. The fact of ownership of property and responsibility therefor should give the owner all reasonable rights of control and management in order to preserve it, else in the end the right to have and to hold property will be seriously impaired.

"The right to conduct a lawful business is a property right, protected by the common law and guaranteed by the organic law of the state. See *L. D. Willcutt & Sons, Co.* v. *Driscoll*, 200 Mass., 110, 117," 85 N. E., 897. *Godin* v. *Niebuhr*, 236 Mass., 350, 351, 128 N. E., 406, 407.

Different reasons are given for the conclusion reached that unionization is an unlawful purpose but chief among them, it would seem, is the fact that to hold otherwise would give union labor a monopoly which is against public policy. Public policy, it is said, demands free competition. To restrict the field of competition by exclusion of non-union labor would not only destroy in large meas-

ure freedom of contract but deny to non-union labor its lawful right to earn its subsistence as it desires. The laborer, whether union or not, in the absence of contract to the contrary, should be accorded the right to work where and for whom he pleases, provided the work be lawful and agreement be reached upon terms of employment. This is not saying that laborers may not unite in their efforts to obtain their lawful rights. It simply means that those who do not see fit to unite may have preserved to them their freedom to contract.

But be it as it may (as to whether *employees themselves* can lawfully strike or picket peaceably to secure unionization), we do not think that it was lawful for *these defendants* to picket even peaceably to secure unionization by the employer of its satisfied and nonstriking employees.

"When necessary to prevent irreparable injury, an injunction will be granted to prevent third persons having no connection with employer or employees, and no interest in the relations existing between them, from inciting or coercing strikes among employees who are not dissatisfied with the terms of their employment and are not seeking an increase of wages." 32 C. J., Sec. 225, page 164, and cases cited in footnote 57.

Reasons urged are (1) that "persons who have no agency for the employees of the company can not set up any rights that the employees might have. The right of the latter to strike would not give to the defendants the right to instigate a strike. The difference is fundamental. *Hitchman Coal, etc., Co.* v. *Mitchell*, 245 U. S., 229, 38 S. Ct., 190, 62 L. ed., 260. (2) Also, the fact that employees were at liberty to quit the employment at pleasure did not deprive the employer of its right to injunctive relief against interference with its employees by third persons seeking to unionize them. *Eagle Glass, etc., Co.* v. *Rowe*, 245 U. S., 275, 38 S. Ct., 80, 62 L. ed., 286." Footnote 57a, 32 C. J., 164.

The employer's right to carry on its lawful business can not be interfered with without just cause or excuse. As to its own employees, it may be said to have opened the door to negotiations with them and the door is not closed, even after they have gone out on

strike. Having taken them into its employment, it may be said to have consented by implication to reasonable discussion of their disagreements and possibly even to peaceable picketing, but it contravenes the fact, express or implied, to say that it has made any such concession or surrender to strangers.

In this case the picketers not only had no grievances of their own against the plaintiff but were not picketing by permission of the employees, or any one else, whether belonging to a union or not, who had any relationship with the theatre company. They were simply attempting to advance the cause of trade unions generally by forcing unionization. That effected might result not only in the incurrence of indebtedness that the business would not warrant, but in giving to strangers at least substantial partial control and management of the plaintiff's business. These picketers, instead of attempting by their conduct to reconcile a difference that had already arisen between the plaintiff and its employees, sought to create trouble between them to the end that the union might indirectly derive a benefit from such newly created trouble. They were not content simply to display the signs stating that the plaintiff was unfair to organized labor, of which there is no proof in the case, but urged the public not to patronize the theatre.

What justification or excuse is there for such interference? The defendants can not justify as agents of the plaintiff's employees for they had no authority. Their belief that it would be better for these employees to join the union, even if true, gives them no right to compel the employees to accept such an alleged betterment. Their intentions might be most laudable but still freedom of thought and action upon the part of the employees is their right without dictation from those of different opinion. The legislature, if it acts constitutionally, may enact law that will compel all employers to unionize; but that result should not be obtained by the compulsory act of strangers. While these defendants no doubt believed that these employees should join the union, the employees themselves were of a different mind, as well as the employer. The plaintiff and his employees had as much right to their views as had these defendants. We do not think it equitable to compel the employees and their employer, all satisfied that no wrong exists between them, to adopt and put into effect the desire of these de-

fendants, who have no property or contractual rights to lose, as have the employer and its employees, if the injunction be denied. Unionization obtained, these employees would lose their jobs unless they joined the union. This Court should neither deprive a laborer of his lawful employment nor force him to join a union at the behest of them who by some courts are called "intermeddlers."

"Defendants set up, by way of justification or excuse, the right of working men to form unions, and to enlarge their membership by inviting other working men to join. The right is freely conceded, provided the object of the union be proper and legitimate, which we assume to be true, in a general sense, with respect to the union here in question. *Gompers* v. *Buck's Stove and Range Co.*, 221 U. S., 418, 439. The cardinal error of defendants' position lies in the assumption that the right is so absolute that it may be exercised under any circumstances and without any qualification; whereas in truth, like other rights that exist in civilized society, it must always be exercised with reasonable regard for the conflicting rights of others. *Brennan* v. *United Hatters*, 73 N. J. L., 729, 749." *Hitchman Coal & Coke Co.* v. *Mitchell*, supra, pages 253 and 254.

"The strike agitators were mere volunteers. They sought mainly to advance their own personal interests by demonstrating to their superiors their usefulness in inciting strikes and their ability to enforce their demands. They assumed the role of those aptly characterized by Vice Chancellor Fallon in *Bayonne Textile Corporation* v. *American Federation of Silk Workers et al.*, 114 N. J. Eq., 307, 168 A., 799, 803, as 'intermeddlers.'" *Elkind & Sons Inc. et al.* v. *Retail Clerks' International Protective Assn., et als.*, 169 A., 494, 496 (N. J.).

In *Harvey* v. *Chapman et als.*, 226 Mass., 191, 115 N. E., 304, it was held that a provision dealer was entitled to an injunction against officers and members of a labor union with whom he had no trade dispute from boycotting his business by means of a false statement that the plaintiff's employees were out on a strike and from seeking by picketing, by displaying banners and by the distribution of circulars to compel the plaintiff to discharge his em-

ployees or to coerce them into paying fees demanded of them by the defendant association. The Court, on page 195, said:

"It needs no discussion to show that such intentional and harmful interference with the plaintiff's business renders the defendants liable, unless there appears a legal justification for their conduct. No such justification is disclosed. There was no real trade dispute between the parties. As there was in fact no strike at the plaintiff's store at any time since July 9, 1915, it is unnecessary to consider what the defendants properly might do under a legal strike."

Also, *Cornellier* v. *Haverhill Shoe Mfg. Assn.*, 221 Mass., 554, 109 N. E., 643; *M. Steinert & Sons Co.* v. *Tagen*, 207 Mass., 394, 93 N. E., 584.

*Harvey* v. *Chapman*, supra, has been cited with approval many times, as in *Olympia Operating Co.* v. *Costello, et als.*, 278 Mass., on page 130, 179 N. E., 804; *Stearns Lumber Co.* v. *Howlett*, supra, on page 65; *Moore Drop Forging Co.* v. *McCarthy*, supra, on page 563, 137 N. E., 919; *Godin* v. *Niebuhr*, supra, on page 352, 128 N. E., 406. In the latter case the Court said, on page 351:

"One who interferes with another's business, for the purpose of compelling present or prospective customers to withhold their patronage, is responsible for the harmful consequences, unless he shows a legal justification for such interference and to constitute such justification, it must appear not only that the interference was in pursuance of a lawful purpose, like trade competition, but that it was carried on by lawful means. The harmful circulation of libelous statements for the purpose of injuring the business of another, is a malicious interference with that other's property rights, for which the wrong doer is answerable in damages."

Also, *Martineau et al.* v. *Foley, et als.*, 231 Mass., 220, 120 N. E., 445.

In the recent case of *Driggs Dairy Farms, Inc.* v. *Milk Drivers' Dairy Employees Local Union No.* 361, *et al.*, 197 N. E., 250 (Ohio), decided January 28, 1935, it was held that injunctive relief would be given to a wholesale and retail marketer of milk, restraining the

officers and members of a labor union with whom it had no trade dispute from picketing its place of business and the places of business of its customers and from boycotting them by displaying banners and circulating handbills bearing false statements and by other methods. In that case no controversy had arisen between the plaintiff and its own employees. The picketers were strangers, members of a union. They displayed banners on which it was stated that the plaintiff company was unfair to organized labor, that it had violated the provisions of N. I. R. A. and it contained an earnest solicitation for support of the purchasing public to refuse to purchase any products which the plaintiff company distributed, the concluding sentence of which was, "Patronize only those men who display a union button." The Court, while granting the injunction against picketing as not justified, did say that the injunction should not "prevent the defendants from reasonable and peaceable persuasion, using only the truth." No doubt by "reasonable and peaceable persuasion" the Court meant fair argument that might successfully carry its appeal to and convince the mind without the use of coercion of any sort.

The defendants rely strongly upon the decision in *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S., 184, in which the opinion was written by the late Chief Justice Taft. In that case the Justice in his opinion asked the question: "Is interference of a labor organization by persuasion and appeal to induce a strike against low wages *under such circumstances* without lawful excuse and malicious?" And he answered it: "We think not." Clearly Justice Taft was not generalizing but speaking of the facts in that particular case. He had just said: "Each case must turn on its own circumstances." The facts therein were quite different from those in this case. In that, unionization was not involved. There was a lawful strike by the employees because of the reduction of their wages, while in this case there not only was no strike but no controversy between the employer and its employees. Furthermore, in that case the defendants represented the strikers, while here the defendants are complete strangers. Speaking of the right of communication between the employees on the job and the defendant picketers, some of whom were ex-employees, Justice Taft, on page 204, said:

"How far may men go in persuasion and communication and still not violate the right of those whom they would influence? In going to and from work, men have a right to as free a passage without obstruction as the streets afford, consistent with the right of others to enjoy the same privilege. We are a social people and the accosting by one of another in an inoffensive way and an offer by one to communicate and discuss information with a view to influencing the other's action are not regarded as aggression or a violation of that other's rights. If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free and his employer has a right to have him free."

Thereafter, on page 206, the Justice said:

"A restraining order against picketing will advise earnest advocates of labor's cause that the law does not look with favor on an enforced discussion of the merits of the issue between individuals who wish to work, and groups of those who do not, under conditions which subject the individuals who wish to work to a severe test of their nerve and physical strength and courage. . . . Regarding as primary the rights of the employees to work for whom they will, and, undisturbed by annoying importunity or intimidation of numbers, to go freely to and from their place of labor, and keeping in mind the right of the employer incident to this property and business to free access of such employees, what can be done to reconcile the conflicting interests?"

Then, dealing with the facts in that case (from which it appeared that at capacity the plant employed sixteen hundred people), the Court permitted "the strikers and their sympathizers" to have "one representative for each point of ingress and egress in the plant or place of business" and it enjoined all others "from congregating or loitering at the plant or in the neighboring streets by which access is had to the plant, that such representatives should have the right of observation, communication and persuasion but with special

admonition that their communication, arguments and appeals shall not be abusive, libelous or threatening, and that they shall not approach individuals together but singly, and shall not in their single efforts at communication or persuasion obstruct an unwilling listener by importunate following or dogging his steps. This is not laid down as a rigid rule, but only as one which should apply to this case under the circumstances disclosed by the evidence and which may be varied in other cases."

In the later case of *Truax et al.* v. *Corrigan et al.*, 257 U. S., 312, Justice Taft commented on his decision in the Tri-City case and said that it held "it was lawful for ex-employees on a strike and their fellows in the labor union" to picket peaceably. We see no warrant for construing the decision as holding that complete strangers, without any relationship to the employees still on the job, could picket, though peaceably, to obtain accomplishment of a purpose, as here unionization, not desired by the employees themselves and contrary to the wishes of their employer.

In addition to *American Steel Foundries* v. *Tri-City Central Trades Council*, supra, the Justice, in denying the issue of the injunction in this case, relied on the decision in *Bomes* v. *Providence Local No.* 223, 51 R. I., 499, 155 A., 581, 582, and from it quoted this language:

"The respondents have the right to persuade the public by any lawful means to patronize or to refuse to patronize complainant's theatre. But this right is not superior to the right of complainant to conduct his business free from unlawful interference. The attempt to unionize complainant's theatre may result in actual injury to complainant but it is not a legal injury unless the damage resulting therefrom is caused by a violation of a legal right of the complainant. There is a violation of such a legal right when the methods used are coercive."

Certain distinctions are to be noted between the Bomes case and the one at bar, for in the former the theatre's former employees were not only members of the defendant union but that union had had a contract with the complainant whereby the complainant had agreed to employ only union help and so the union, it may be said, was speaking with some authority for ex-employees of the com-

plainant. The union in reality by the picketing was attempting to secure a renewal of the former contract in behalf of union members who had previously been employed by the complainant. And yet in that case the judgment appealed from by which the injunction had been granted was affirmed and Chief Justice Stearns said:

"In the circumstances and in view of the deliberate violation by respondents of the rights of complainants, we think that to now permit any picketing in the limited space near the theatre would inevitably result in the obstruction of the public use of the street and sidewalk and added injury to complaint. For the reason stated we are of the opinion that the injunction was warranted in this case."

In *Stillwell Theatre Inc.* v. *Kaplan*, 259 N. Y., 405, 182 N. E., 63, cited by defendant's counsel, the picketers were not only ex-employees but there had been a contract whereby the employer had agreed to employ only members of their union. The theatre company made a new contract of like effect with another union so the real controversy was between the two unions. There did not enter into it the question of unionization. It was simply a question whether the union and its members who had been employees under the contract not renewed could picket to the end that they might be re-employed. The Court held that it would not decide such a controversy and enjoin the picketing unless it were shown that violence, deceit or misrepresentation was employed to bring about the desired results.

New York is one of the states that holds a strike to unionize is lawful, but as we understand the Stillwell case, it does not go so far as to hold that strangers who have had no contractual relationship either with the employer or the employees have the right to picket, though peaceably. That the New York Court might so hold is indicated by its fairly recent decision in *Julie Baking Co., Inc., et al.* v. *Graymond, et al.*, 274 N. Y. S., 250, in which, although it was a case not involving organized labor, it was held that members of a neighborhood organization could peaceably picket against a bakery in protest of alleged extortionate prices for necessities. Still, the same Court granted an injunction in *A. S. Beck Shoe Corp.* v. *Johnson*, 274 N. Y. S., 946, enjoining picketing by some

negroes who by their picketing were attempting to compel the shoe corporation to employ a certain percentage of negro help in place of white persons. In the latter case, the Court having commented on its decisions revealing the history of that state's judicial attitude toward labor injunction, said, on page 952:

"In other words, this broad liberal policy permitting concerted action to interfere with the business of employers is specifically limited to labor disputes."

As indicated in the note to the Beck case in Harvard Law Review, Vol. 48, page 691, it is difficult to justify such a distinction.

Counsel for the defendants have cited other cases which have been carefully examined but in no one of them do we find authority for denying the issue of the injunction under the facts in this case, unless we take the ultra-liberal view (and there is no evidence in this case to support it) that social values and necessities justify such interference upon the part of strangers.

"In determining whether this justification exists, the social value of the ends sought and the necessity for picketing to secure them should be weighed against the prospective injury to both the public and the person picketed." Harvard Law Review, Vol. LXVIII, page 691.

Are the ends sought of sufficient social importance to justify peaceable picketing by these strangers under the facts in this case? We do not feel that they are.

Picketing is defined in Bouvier's Law Dictionary, Baldwin's Century Edition, page 935, as "posting members at all the approaches to the works struck against for the purpose of reporting the workmen going to or coming from the work; and to use such influence as may be in their power to prevent the workmen from accepting work there."

In *Jones* v. *Van Winkle Gin & Machine Works*, 62 S. E., 236 (Ga.), it is said that "The very word 'picket,' is borrowed from the nomenclature of warfare, and is strongly suggestive of a hostile attitude towards the individual or corporation against whom the labor union has a grievance."

In *Union Pacific Railroad Co.* v. *Ruef, et als.*, 120 Fed., 102,

121, it is declared that "'picketing' has been condemned by every Court having the matter under consideration. It is a pretence for 'persuasion' but is intended for intimidation. Gentlemen never seek to compel and force another to listen to the art of persuasion. To stop another on the street, get in his road, follow him from one side of the street to another, pursue him wherever he goes, stand in front of his residence, is not persuasion."

Even peaceable picketing is not intended to affect only the employer and its employees. Its purpose is also to involve the public in the controversy. It seeks to use the public as a cudgel. Besides desiring to secure its approval on the merits of the issue, its particular purpose is so to arouse and inflame it that it will not patronize the employer unless under compulsion the employer accedes to the demands of the picketers. Fair argument failing, loss of patronage by its incited customers must make the employer abandon its lawful right to manage, control and perhaps save its business. If public opinion thus obtained, resulting beneficially to union labor, affected adversely only the employer and employees, it would not be quite so harmful, but the natural tendency of such public opinion, created in a forge of white heat, is to manifest itself in ways decidedly against the best interests and welfare of society itself.

Sir Basil Thomson, author of "The Story of Scotland Yard," in speaking of riots (natural products of bitter labor conflicts) has quoted from an American writer, Mr. Melville Lee, as follows:

"When this moment arrives all self-control is repudiated; decent and orderly men become desperadoes; cowards are inspired by a senseless bravado; the calm reason of common sense gives place to the insanity of licence, and unless the demoralizing tendency is checked, a crowd rapidly sinks to the level of its most degraded constituent. The explanation of these phenomena is probably to be found in an excessive spirit of emulation, aroused under conditions of excitement, which makes a man feel that the responsibility of his actions is no longer to be borne by himself but will be shared by the multitude in which he has merged his identity."

Peaceable picking, so called, is conceived in battle; its real purpose is to conquer. It would compel acquiescence, not induce it by mere persuasion. Unquestionably its tendency is always militant. Then is it really in the interest of society to foster it? Disregarding its effect upon the contractual and property rights of the picketed and conceding its efficacy as an aid to unions in securing victories in labor conflicts, are the ends thus obtained of sufficient social value to justify it? Peace and contentment between employer and employe are to be recognized, commended and safeguarded. There were such between this plaintiff and its employees. The interests of society do not require their termination at the hands of these non-related defendants. This interference, even if it had not reached the stage of threats, intimidation or coercion, force or violence, can not be justified as society-required.

We do not wish to be understood as denying the right of the representatives of the unions by proper speech and persuasive argument to attempt the conversion of any employer to their belief that unionization is best; we would not so limit freedom of speech; but we see a distinction between peaceable persuasion by speech and peaceable picketing. True, the latter is said not to have in it force or violence, threats, intimidation or coercion, yet in all picketing there is an element not appearing in fair argument and a reasonable appeal for justice.

The picketer, in this case, however peaceable, in effect says to the employer: "Here I am at the entrance of your theatre and here I shall remain until you accede to my demands. I shall brand you as unfair to labor and so prejudice the public and your present satis-fied employees against you and your business that you must choose between submission and its possible destruction."

Recently a Maine writer of distinction has truly stated: "Justice, defined correctly, . . . is the largest measure of individual liberty consistent with the rights of others."

Would we give the right to picket peaceably to the employer's own employees (and this we do not decide), we can not grant it to these defendants without destroying that consistency of rights absolutely essential to effect justice.

Social welfare does not demand that non-related persons or or-ganizations shall have the right, even by peaceable picketing, to

414

attempt to break down and destroy a satisfactory relationship between an employer and its employees in order to supplant it by another whose terms are satisfactory only to the dictators of it. To permit such an enforced and unwanted substitution would violate that right of contract and freedom of action that in large part have made possible the industrial development of this nation. It would tend to thwart ambition and destroy initiative. It would be taking a long step toward socialistic control of private business and industry. To allow any organization, whether a union or not, without warrant of constitutional legislative action, to dictate the business policy of an industry, whether owned by an individual or a corporation, even though that which is dictated would benefit the members of the organization compelling it, there being no relationship between the organization and the employer and its employees, nor labor dispute, nor strike, would tend to destroy very materially that liberty which under our democratic form of government the people are entitled to have and retain.

*Appeal and exceptions sustained.*
*Decree below reversed. Bill sustained.*
*Case remanded for issue of writ of injunction.*