**UNITED STATES COAL CO. v UNEMPLOYMENT COMPENSATION BOARD OF REVIEW OF OHIO et**

Common Pleas Court, Cuyahoga Co.

No. 491256. Decided Dec. 26, 1939.

Taplin & Taplin, Cleveland, R. E. Scott and H. E. Faught, Cambridge, for plaintiffs.

T. J. Herbert and William Durkin, Cleveland, for the attorney general.

John Cinque, Jr., of Bellaire, W. B. Bartels and W. Lavelle, Columbus, for defendants.

## OPINION

By HURD, J.

This case comes before this court for review on appeal from the decision of the Unemployment Compensation Board of Review of the Unemployment Bureau of Ohio under and by virtue of the provisions of §1346-4, GC. Said section is a part of the Unemployment Compensation Act, so-called, originally passed by a special session of the 91st General Assembly, December 16, 1931, which as amended is now composed of §§1345-1 to 1346-5 inclusive, GC.

This action originated when one, Charles Ambrose of Bradley, Ohio, an employee of the United States Coal Company, plaintiff-appellant, made application on or about April 1, 1939, to the Bureau of Unemployment Compensation for benefits under the provisions of the act. Thereafter, upon hearing before the administrator, his claim was disallowed on May 9, 1939, by said administrator on grounds, as follows:

"It is the determination of the administrator of the Bureau of Unemployment Compensation that the present condition existing in the Ohio coal mining region constitutes a strike and all claimants unemployed due to this strike are ineligible for benefits under §1345-6 (c) of the Ohio Unemployment Compensation Act. * * *"

Thereafter, on May 19, the claimant appealed, denying that he lost his employment or left his employment by reason of a strike in the establishment in which he was employed.

Thereafter the Board of Review heard said appeal, the case of the claimant being consolidated with the appeals of all other employees of the plaintiff, and on August 29, rendered its decision, reversing the decision of the administrator and allowing the claim for benefits on grounds as follows:

"The great weight of evidence clearly shows that claimant did not lose his employment because of a strike in the establishment in which he was employed, but as a result of cessation of mining operations after March 31, 1939, due to the non-existence of a basic agreement between operators and miners and the refusal of the operators to accept the miners' proposals for extensions of the old basic Appalachian agreement at the expiration thereof, pending orderly negotiations provided by law."

Thereafter the plaintiff employer filed his petition for review of the decision of the Board of Review, which in pursuance of law, prepared and certified a transcript of the proceedings to this court and the case is now before this court for review upon the evidence set forth in said transcript.

Upon a review of the record we are of the opinion that the findings of fact contained in the majority opinion of the Board of Review are in accord with

the evidence. It appears also that the plaintiff does not seriously dispute these findings of fact but claims that the Board of Review drew erroneous conclusions therefrom. Said findings of fact are as follows:

"On and prior to March 31, 1939, the above entitled claimant and other claimants, whose appeals are consolidated herewith, were miners in the employ of The United States Coal Company, which operates Crow Hollow Mines No. 1 and No. 2, near Bradley, Ohio. Claimant who worked in Mine No. 1, is a member of Local Union No. 2080 of District No. 6, International Union United Mine Workers of America, a voluntary labor organization. Employer is a member of the Ohio Coal Association, a voluntary organization of mine operators. Claimant and other employees worked under a basic agreement, known as the Appalachian Agreement, entered into on April 1, 1937, by and between various operator associations (including Ohio Coal Association) and the United Mine Workers of America. Similar agreements had been executed in 1933, 1934 and 1935. The 1937 agreement, together with the district agreements based thereon, set forth the hours, wages and conditions of employment of employees in union mines in the so-called Appalachian field. By its own terms this agreement expired at midnight, March 31, 1939. Included in it was a provision that a joint conference of representatives of the various operators' associations signatory thereto and of the International Union of the United Mine Workers of America, and the various districts thereof, should be held in New York City on March 14, 1939, 'to consider what revisions, if any, shall be made in this agreement as to hours, wages and conditions of employment.'

"Testimony showed that the fundamental purpose of the Appalachian Joint Conference is to establish a uniform competitive relationship in the Appalachian field by formulating a basic agreement governing hours, wages and conditions of employment in the mines of signatory operators and associations in the Appalachian coal producing districts. Operators and miners duly elected their respective representatives to this 1939 conference which convened pursuant to the provisions of the 1937 agreement, but at the expiration thereof no new agreement had been executed. Thereafter there was a general cessation of bituminous mining operations in the state of Ohio, and claimant and other employees became separated from their employment, whereupon they applied for benefits under the Ohio Unemployment Compensation Act.

"At the hearing before the board it was established that on the opening day of the joint conference in New York, representatives of both operators and miners submitted various demands or proposals, to be used as a basis for negotiations. Among other things the miners demanded a clarification of the enabling clause of the agreement and this was interpreted to be a demand that the United Mine Workers of America be designated as exclusive bargaining agent for the miners. Among other things the operators demanded an agreement providing for a wage cut. Discussion of these demands occupied most of the time and attention of the conferees during the entire period between March 14 and March 31.

"On March 16 the miners' representatives suubmitted the following resolution:

"'In order to allay any public apprehension concerning the possibility of a suspension of mining operations in the bituminous coal industry due to the expiration of the existing wage agreements, this joint conference

"'RESOLVED, That in the event no agreement is reached by March 31, 1939, that work in the industry shall be continued under the existing wages, conditions and contracts, pending continuance of negotiations and ultimate success or failure to agree on a new contract.'

"Operators' representatives rejected this resolution. Subsequently, between March 16 and March 31, the miners'

representatives submitted proposals to extend the existing agreement for period of 30 days, 60 days, 90 days, and 6 months, but in every instance these proposals were rejected by the operators' representatives.

"On March 28, the following resolution was adopted by the Joint Conference:

" 'RESOLVED, that in the event no wage agreement has been negotiated before the date of expiration of the existing Agreement that the Joint Conference authorize the continuance of work by all necessary maintenance men; Provided that such men shall be paid the present wage for their services in their respective classifications, plus any increase or adjustment that may come in the working out of the base agreement which shall be retroactive as affecting these men as of April 1, 1939. All details affecting the application of this arrangement shall be adjusted between the representatives of the operators and the representatives of the United Mine Workers of America, in their respective districts.'

"On March 31, the day on which the existing agreement was to expire, the miners' representatives submitted a resolution providing for a renewal thereof, plus the inclusion of a provision for a 'closed shop', for a period of two years from April 1, 1939. This resolution was rejected by the operators' representatives, who countered with a resolution providing for a renewal of the existing agreement, without change, for a period of two years from April 1, 1939. This resolution was rejected by the miners' representatives. Consequently, at midnight of March 31, the old agreement expired, no new agreement had been executed, and general cessation of mining operations followed. Conference negotiations continued from day to day without break until May 12, 1939, at which time a new agreement was executed. Thereupon most of the mines in Ohio resumed operations. The new agreement embodied the demand for a 'closed shop' that was included in the miners' resolution on March 31, and also designated the United Mine Work-

ers of America as exclusive bargaining agent for the miners. Representatives of both operators and miners were signatories to this agreement.

"It was established that at the Joint Conference the representatives of both operators and miners had full authority to agree to an extension of the existing agreement; that in 1935, at the expiration of the 1934-1935 agreement, which was similar to the agreement expiring March 31, 1939, the Joint Appalachian Conference extended the old agreement at various times; that the mines continued to operate and representatives at the conference continued to negotiate during such extensions. On one occasion, following the expiration of 1934-35 agreement and one of its extensions, the Joint Conference adjourned *sine die.* Thereupon a strike call was issued by the International Policy Committee of the United Mine Workers of America, but before it became effective negotiations were resumed, a further extension of the expired agreement was executed, and the strike call was rescinded. In 1939 no strike call was issued and there was no evidence that at any time in the past a strike call was issued during conference negotiations.

"There was testimony on both sides that toward the end of the suspension period in 1939, a labor representative of the United States Government strongly urged that in the event a new agreement could not be reached without further delay that the conference disband and that individual operators make their own separate agreements with their employees. However, the execution of the new agreement on May 12 made such procedure unnecessary.

"Testimony at the hearing before the board established that subsequent to March 31 and during the suspension of operations, groups of miners who had lost their employment resorted to 'tactics' claimed by operators to be typical of strikes; that these groups of miners intimidated and threatened these operators and their employees who attempted to mine and deliver coal during the general cessation of mining opera-

tions; that these groups served notice on various operators that coal could not be produced except for certain emergency and public utility purposes, and that in a number of instances they required prospective consumers to execute affidavits of need before they would permit coal to be mined and delivered for such purposes; that there was picketing of union as well as non-union mines that attempted to operate without a contract. There was, however, no evidence of picketing at employer's mines.

"At the hearing employer and other operators contended that at all times subsequent to March 31 they were desirous of operating their mines, but that such operation was impossible for the reason that the miners refused to work. They testified that their participation in the Joint Conference did not prevent them from entering into separate agreements of employment, in the event of failure of the conference to reach a new basic agreement before the old agreement expired. Claimant and other miners testified that they were desirous of working, but would not work without a contract, and evidence offered by both parties was to the effect that this refusal to work in the absence of contract was the custom, with both parties having knowledge thereof.

"There was evidence that employer made no affirmative offer of work to its employees after March 31; that employer made the miners no offer of a separate agreement; that it did not post a 'work' sign at the mine where claimant was employed or at any other usual place of posting, nor did it give any other indication that work was available; that in fact during the entire suspension an 'idle' sign was posted for the mine where claimant worked; that no orders emanated from employer's main office relative to notification of employees that work was available for them, either under the old contract or otherwise."

It appears that this is the first case coming before any court of this state for review of a decision of the Board of Review of the Unemployment Compensation Bureau. That the questions presented are somewhat complicated is indicated by the fact that the decision of the administrator was reversed by the Board of Review by a divided board, and also by the fact that there has been a great variance apparent in the decisions of other state jurisdictions involving claims for benefits under other unemployment compensation acts, growing out of the cessation of operations in the bituminous coal mining industry throughout the nation. In this connection it may be well to note that counsel representing both sides of this controversy have cited many rulings and decisions involving the construction of unemployment compensation acts of other states, upon a review of which we conclude that although the same may be helpful generally in an understanding of the problem here presented such rulings and decisions can not be accepted as authority in this case, because of the lack of uniformity in the language and provisions of the various acts of other jurisdictions. For instance, many other state jurisdictions deny benefits in the event of a "labor dispute," whereas the Ohio law denies benefits in the event of a "strike" as distinguished from a "labor dispute". Therefore, this decision must be based upon a fair and liberal construction of the provisions of the Ohio Unemployment Compensation Law and the particular facts and circumstances of the instant case, taking into consideration the relations of the parties as disclosed by their express agreements, their past dealings, customs and traditions. Where the act is silent as to the meaning of important terms we must have recourse to the doctrine of **stare decisis**, in the application of well founded legal principles.

Let us first consider the nature and purpose of the act. The purpose of the act as stated in §1345-34, **GC,** is as follows:

"PURPOSE. This act is enacted as a part of a **national plan of unemployment compensation and social security**

for the purpose of assisting in **the stabilization of employment conditions."** (Emphasis ours).

**Sec. 1345-6** provides in part, as follows:

"No individual shall be entitled to any benefits unless he or she

1. Is capable of and available for work;

2. Is unable to obtain work in his usual trade or occupation or in other employment for which he is reasonably fitted including employments not subject to this act. * . * *;

3. Has registered at an employment office or other registration places maintained or designated by the administrator or has otherwise notified the Bureau of Unemployment Compensation of the unemployment in accordance with its rules * * *;

4.(c) No benefits shall be payable to any individual who has lost his employment or has left his employment by reason of strike in the establishment in which he was employed as long as such strike continues or whose unemployment has been directly caused by an Act of God; or who becomes unemployed by reason of commitment to any penal institutions; or who refuses or fails to report to the bureau, * * *."

From all of the foregoing we conclude that the broad intent and purpose of this act is to provide against the risks of unemployment by granting security and compensation to those persons who become separated from their employment through no condition of their own creation or by conditions beyond human control and who are capable of and available for work and unable to obtain work in their usual trade or occupation or other employment for which they are reasonably fitted, but who otherwise conform to the requirements of the act.

**Sec. 1346-4** provides in part:

"Any employer or employee who may be affected by the decision of the Board of Review * * * may * * * * appeal from such decision to the Common Pleas Court * * *. Such appeal shall be lodged with such court by the filing of a petition against such board and the issuance of summons to such board. The board shall thereupon have prepared and certified a transcript of its proceedings and the appeal shall be heard upon such transcript and **the decision of the board shall not be modified or reversed unless such court shall find that such decision was unlawful, unreasonable or against the manifest weight of the evidence."** (Emphasis ours).

**Section 1345-33** contains an important provision as a guide to the court in construing the act, as follows:

"This act shall be **liberally construed to accomplish the purposes thereof.**"

The plaintiff complains of error on seven particular grounds which may be condensed and grouped into three general assignments of error, as follows:

1. Error claimed in finding that the claimants did not lose their employment because of a strike in the coal mining industry including the establishments in which the claimants were employed.

2. Error claimed in finding in favor of the claimants as to their eligibility for benefits under the preliminary requirements of the act.

3. Error claimed in the exclusion and admission of evidence.

We shall consider these assignments of error in the order named.

Considering first the claim that the claimants are not entitled to benefits because they left their employment due to a strike in the coal mining industry, including the establishment at which the claimants were employed, it is clear that this issue presents a single question for determination, namely, was the cessation of the coal mining operations during the period from April 1, 1939 to May 12, 1939, the result of a strike within the meaning of §1345-6(3), GC. The pertinent part of this section above quoted is as follows:

"No benefits shall be payable to any individual who has lost his employment or has left his employment by reason of a strike in the establishment in which he was employed, as long as such strike continues * *." (Emphasis ours).

What is meant by the term "strike" as used in this act?

The act does not contain a definition. This much is certain, however, that in relation to the term ██ "strike" it is the intent and purpose to exclude from the benefits of the act all of those whose separation from employment was directly created by some act or conduct of their own.

The definition of a "strike" which seems to have the greatest acceptance is that contained in the case of Iron · Moulders' Union v Allis Chalmers Co., 166 Fed. 45, 52, as follows:

"A 'strike' is cessation of work by employees in an effort to obtain more desirable terms."

Other definitions are as follows:

"A 'strike' is a cessation of work as a means of enforcing compliance with some demand upon an employer." People on Complaint of Mandel v Tepel, Mag. Ct. 3 N. Y. S. 2d, 779, 781.

"A 'strike' is cessation of work by employees in an effort to get for the employees more desirable terms." Jeffrey-DeWitt Insulator Co. v National Labor Relations Board, C. C. A. 4, 91 Fed. 2d, 134, 138; Restful Slipper Co. v U. S. Shoe Leather Union, N. J. Ch. 174 A., 543, 545, 116 N. J. Eq. 521.

"A 'strike' is a combined effort among workmen to compel the master to a concession of a certain demand by preventing the conduct of his business until compliance with the demand." Keith Theater v Vachon, 187 A. 692, 694, 134 Me. 392.

"A 'strike' is an agreed cessation of work—intended to be temporary—by employees in an effort to █ obtain from their employer more favorable terms or working conditions than the employer furnishes, or is willing to furnish. Ordinarily a strike also involves active measures by the strikers to bring about the end sought by them and their reinstatement in their former position of employment. The relation of employer and employee is a condition precedent to a strike; a strike can be said to exist only where there is a trade dispute between an employer and his workmen. The expiration of the time limit of a previous contract of employment does not so terminate the relation of employer and employee as to prevent a dispute between the parties as to the terms of the employment from being a legitimate trade dispute." 24 O. Jur. §46, 655.

"A 'strike' in the labor sense is a stoppage of work by common agreement on the part of a body of workingmen for the purpose of obtaining or resisting a change in the conditions of employment." Park et v Locals No. 106 et, 22 O. N. P. (N.S.) 257.

"A concerted or general quitting of work by a body of employees in order to coerce their employer or employers in some way, as when higher wages or shorter hours are demanded or reduction of wages is resisted; any general refusal to work or to continue some procedure as a coercive measure." Century Dictionary.

"Strike. An act of quitting work; such an action done by mutual understanding of a body of workmen as a means of enforcing compliance with demands made on their employer; a stopping of work by workmen in order to obtain or resist a change in conditions of employment." Webster's New International Dictionary, 2d Edition.

"A 'strike' has been defined as a stoppage of work caused by the act of employees as result of failure to agree with their employer as to wages, hours or

some other terms and conditions of employment." Michaelson v U. S. 291 Fed. 940.

"A strike has been variously defined by the courts as 'a combination to quit work,' 'a simultaneous cessation of work on the part of the workmen;' 'the organization of concerted simultaneous cessation of work by bodies of workmen;' 'cessation of work by employees in an effort to get for the employees more desirable terms;' the act of quitting work by a body of workmen as a means of enforcing compliance with demands made on their employer; a concerted refusal to serve in an industry, either to assert a supposed right or to obtain an economic advantage; a general concerted refusal by workmen to work in consequence of an alleged grievance; 'a combination among laborers, those employed by others, to compel an increase of wages, a change in hours of labor, some change in the mode and manner of conducting the business of the principal, or to enforce some particular policy in character or number of the men employed, or the like;' 'a combined effort among workmen to compel the master to the concession of a certain demand, by preventing the conduct of his business until compliance with the demand.'" Oakes, Organized Labor and Industrial Conflicts, 411, §308.

We conclude from these definitions and many others that the term "strike" connotes **some positive action by employees.** There is inherent in all of these definitions the idea of unilateral action, i. e., action by the employees in refusing to work or in the stoppage of work in concert with each other, to secure more favorable terms. This we may distinguish from bilateral action where both employer and employee by mutual assent bring about a cessation of employment. Where the unilateral action is on the part of the employer the result is a lock-out instead of a strike.

"A lock-out is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms." Iron Moulders' Union v Allis Chalmers Co., **supra.**

We gather that the term "strike" implies an adversary or hostile position on the part of the employees, not as a state of mind alone, but by some positive course of concerted conduct in a stoppage of work calculated to enforce compliance with claims for the adjustment of grievances fancied or real or to secure some improved status in their relations with their employer.

It is contended by the plaintiff among other things that the mines were in the same condition on April 1, as they were on March 31, when the day's work was done; that there were orders to be filled; that the equipment was left in place and not withdrawn as is customary during a period of suspension; that the operators desired to work but the men failed to respond to work; that on the last day of the Appalachian Joint Conference the operators offered to renew the basic agreement for 2 years on exactly the same terms and conditions contained in the expiring basic agreement, that this offer was voted down by the miners' representatives who insisted upon a closed shop as a condition of renewal, and that these facts and other facts and circumstances set forth in the record constituted a strike by the miners, and that, therefore, the Board of Review erred in holding to the contrary. It is claimed further that there was a labor dispute in existence from March 14th to May 12th, and that therefore the cessation of operations was in fact a strike.

In order to have a complete understanding of the question presented it is necessary to consider the relations of the parties in respect of these matters, as fixed by express contract.

At the time of the Appalachian Joint Conference in question the relations were fixed by the terms and provisions of an agreement in writing called "The Appalachian Agreement." This agree-

ment, by its terms, became effective April 2, 1937, and expired March 31, 1939. It contained two very important provisions bearing upon the question here at issue the first of which is:

"It is agreed that this contract is for the **exclusive joint use and benefit of the contracting parties,** as heretofore defined and set forth in this agreement; and it shall be construed as binding upon and effective in determining **only the relations with each other of those represented by the parties signatory hereto.** It is the intent and purpose of the parties hereto that this agreement will promote an improved industrial and economic relationship in the bituminous coal industry, and to set forth herein the basic agreements covering rates of pay, hours of work, and conditions of employment to be observed between the parties in the following districts constituting the Appalachian Territory." (Emphasis ours).

There are three propositions worthy of emphasis in this paragraph, namely:

a. That the contract is for the **exclusive joint use and benefit of the contracting parties** and shall be construed as binding and effective **only** in determining the relations with each of those represented by the parties signatory; and

b. That it is the intent and purpose of the agreement to **promote and improve an industrial and economic relationship in the bituminous coal industry;** and

c. To set forth **basic agreements covering rates of pay, hours and conditions of employment.**

It is our conclusion that any interpretation or construction of this agreement must be in the light of these provisions so as to effectuate its terms in carrying out the intent and purpose of the agreement. Therefore, it follows that the acts and conduct of the parties while engaged in any activities in pursuance of this agreement must be considered and analyzed in the light

of its terms, and further, that acts and conduct of parties not signatory should be excluded from consideration.

The second important provision of the agreement, bearing upon this controversy, is as follows:

"**Appalachian Joint Agreement.** A joint conference of representatives * * * shall be held in the city of New York, March 14, 1939, to consider what revisions if any shall be made in this agreement as to hours, wages and conditions of employment." (Emphasis ours).

In order to gain the true intent and purpose of this provision it must be construed with the first provision above quoted. Such a construction leads to the conclusion that the Appalachian Joint Conference held in New York from March 14 to May 12th was to consider what revisions if any were to be made in this basic agreement, and in order to effectuate the purposes stated it was the intention that all parties signatory represented at said conference should be bound by the acts of their representatives in conference assembled until such time as an agreement was concluded in respect of the basic agreement as to hours, wages and conditions of employment or until there was a failure of agreement brought about either by a revocation of the authority of their representatives or an adjournment of the conference sine die. The facts disclose that there was neither a revocation of authority of any of the representatives nor an adjournment sine die until the new agreement was concluded on May 12th. Therefore, it is our conclusion that the parties are precluded now from maintaining that their representatives lacked authority to act for them and in their behalf so long as said conference was in session.

It should also be considered in this connection that the contractual relationship thus established by the 1937 basic agreement was merely a continuation of jural relations theretofore established and maintained between the operators on the one side and the miners

on the other over a period of many years. This is conclusively shown by the evidence or similar basic agreements for the years 1933 and 1934, and 1935. An examination of these agreements discloses language and phraseology identical in form and substance except as to dates and places as that above quoted from the 1937 agreement.

The history of the relations of the parties in the industry clearly and conclusively shows that the basis of all employment in the Appalachian territory was through basic agreements entered into in writing, not by and between individual employers and individual employees, but rather by their respective representatives in conference assembled, and that district agreements were made in like manner, embodying the basic rates of pay, hours of work and conditions of employment set forth in the Appalachian basic agreement. Thus by custom, tradition and express contract jural relations were established by the respective groups through representatives of their own choosing, each selecting and empowering their representatives as delegates to act for them and in their stead in joint conference, each group of delegates being granted the power to bind their principals in conference assembled. This is all very important as bearing upon the contention of plaintiff that upon March 31, 1939, the date of the expiration of the agreement the parties were free agents, so to speak, and that the mines being in the same condition on April 1st as on the work day preceeding, there being orders to be filled, and equipment being in place, that the operators were desirous of operating, but that the men failed to report to work and, therefore, the cessation of operations was due to a strike.

It is our opinion that so long as the joint conference continued in session for the purpose of continuing negotiations in pursuance of the terms of their agreement, neither the individual operators nor individual employees were free agents, by reason whereof the individual operators and individual miners were not in a position to contract individually as such action would be in violation of the letter and spirit of their contractual relations. All parties were bound by the result of the deliberations and agreements of the Appalachian Joint Conference. Likewise by contract, custom and tradition established over the years any procedure of attempted individual dealing while the conference was in session without an agreement having been reached would be such a radical departure from the expressed intent, purpose and policy of their relations, as to be beyond the reasonable contemplation of the parties. Thus, we conclude that the contention of plaintiff that there was an obligation or duty resting upon the employees to report for work on April 1st in the absence of a basic agreement while the conference was in session can not logically be sustained.

We come now to a consideration of the more important phase of the controversy, and that is as to what took place as bearing upon the question at issue during the course of negotiations and deliberations of the delegates in conference assembled. In this connection we shall consider the contention of the plaintiff that the operators through their representatives having proffered on March 31, 1939, a renewal of the basic contract or agreement for 2 years on the same terms and conditions, and that the employees having failed or refused to accept said proffer unconditionally, the ensuing cessation of operations was in fact and law due to a strike of the employees.

It is our view, keeping in mind the contractual relations existing between the parties hereinbefore described that the very purpose of the conference was to consider what revisions, if any, were to be made in the basic agreement and that neither the operators or the miners were bound in any way to accept unconditionally the offers of the other. The very purpose of the conference was to consider, to deliberate, to negotiate, and finally if possible to secure a meeting of the minds of the parties in a renewal of their basic

agreement on terms if not mutually satisfactory at least mutually acceptable in the light of all surrounding facts and circumstances. Therefore it would appear that the hypothesis which plaintiff assumes, namely, that the miners in refusing to accept unconditionally the offer of the operators for full and complete renewal of the basic agreement, without any revisions thereby became strikers is untenable. The fact that the conferees failed to reach an agreement at this time did not **ipso facto** create a condition of "strike". The delegates might have terminated their joint conference at this point but they elected to remain in session and to continue their deliberations which were ultimately successful on May 12th when there was a meeting of the minds in the new basic agreement. The failure of agreement on March 31, was merely a state of mind as to each group where agreement at that time was impossible. A strike can not exit merely as a state of mind. Neither can a lockout exist merely as a state of mind. In each case thought must go out into action. **Positive action** by the **employees** in the case of a **strike** and **positive action** by the **employers** in the case of a **lockout.**

While we entertain the view that the relationships, activities and attitudes of the parties in respect of the question at issue are to be determined in the light of their contractual obligations and their proceedings in joint conference in pursuance thereof, nevertheless we do not find in the record the usual **indicia** of strike activities as between the operators and miners represented in the joint conference. No strike call either formal or informal was issued by the officers of the miners' organization to the miners in the Appalachian territory. Likewise there was no picketing of the plants of the employers. It is true there were disorders and disturbances, accompanied by deplorable and unfortunate incidents in connection with mines, other than those operating under the Appalachian agreement, the responsibility for which we are not called upon to fix in this case, which

as we view it has to do only with the activities and relationships of the parites signatory to the Appalachian agreement, as hereinbefore stated.

We come now to a consideration of whether or not a "labor dispute" existed from and after March 31st to the date of the new agreement on May 12th. It is contended by the plaintiff that such a dispute existed and that under the authority of the case of La France Co. v Electrical Workers' Union, 108 Oh St 61, the term "labor dispute" is synonymous with the term "strike". The majority opinion of the board of review held, that this situation did not constitute a "labor dispute". In view of the provisions of the Ohio Unemployment Act, which disqualifies for benefits only in the event of a "strike" as distinguished from other jurisdictions where the term "labor dispute" is used, we think a decision of this question of whether or not a "labor dispute" existed is not absolutely necessary to a determination of this issue. However, because the plaintiff contends that the terms "strike" and "labor dispute" are synonymous and contends further that because there was a "labor dispute" the cessation of work must be termed a "strike" we wish to give this question some consideration.

It is our view that the failure of the parties to agree upon a renewal at the date of expiration did result in a "labor dispute" which continued in effect until an accord was reached by a meeting of the minds of the parties in a new basic agreement on May 12, 1939. It is conceded by both sides that the relationship of employer and employee continued after the expiration of the agreement and as long as the Joint Conference was in session. In our opinion, considered in the light of numerous decisions, this is the correct view. Therefore, although there was a cessation of work by virtue of the expiration of the "work" clause of their contract the employers and employees, through their representatives were still engaged in pursuance of the "bargaining" clause of their contract in attempt-

ing to agree upon terms in which attempt they were ultimately successful. A good test to apply to this situation would be the familiar one of whether there would have been a right in the employees if there had been a termination of the Joint Conference to engage in peaceful picketing due to the existence of a legitimate trade dispute. It is our opinion that the question would have to be answered in the affirmative in harmony with decisions of this and other courts. We can not agree however with the contention of counsel that the terms "labor dispute" and "strike" are synonymous, on the authority of La France Co. v Electrical Workers' supra, or on the authority of any other Ohio decisions. It is our considered view that the La France case, supra, is authority only for the proposition of the right of employees to engage in what is termed "peaceful picketing" as expressed by the syllabus of that case, as follows:

"Picketing the plant of an employer by strikers during a strike, and peaceful discussion with and persuasion of employees to leave their employment, which under the terms of their contract is terminable at will, and peaceable persuasion of men applying for employment not to work for that particular employer, if unaccompanied by physical violence, abuse, intimidation, or any form of coercion or duress, direct or indirect, are not unlawful, and can not be enjoined."

The question presented in that case as expressed by the court in its opinion at page 83, is as follows:

"May men who have left their employment temporarily, for the purpose of bringing pressure to bear in the interests of changing the conditions under which they labor, peaceably picket and persuade men who are in their former employers' service to cease their work, and may they also, without the use of violence, persuade men who contemplate entering their former employers' service not to do so; or are such acts, even though done in pursuance of the strike purpose, illegal and subject to injunction?"

The answer to the question is contained in the syllabus above quoted.

If we were to place in juxtaposition any acceptable definition of the term "strike" and the term "trade dispute" we believe that the conclusion must be obvious that the terms are not synonymous. We have given some definitions of the term "strike". The term "labor dispute" adopted by the majority opinion is taken from Sec. 2, Subsection 9 of the National Labor Relations Act (1935) as follows:

"The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer or employee."

It seems to us that although every strike must perforce be the result of labor dispute, or an active form of a labor dispute, nevertheless it does not follow therefrom that every labor dispute is a strike. The form and character of labor disputes are many and varied. Many labor disputes, perhaps the greater number, are settled and adjusted by arbitration or by negotiation in the absence of a strike. In fact the labor dispute in the instant case was settled and concluded by the parties in the terms of the new Appalachian basic agreement of May 12th. It is our conclusion that there is a clear distinction between the terms "strike" and "labor dispute" and that the labor dispute which developed in this case did not terminate in a strike by the employees, within the meaning of §1345-6(3) of the Ohio Act.

We come now to a consideration of that phase of the case which has to do with the many offers of the representatives of the miners made to the representatives of the operators to tide

over the period of temporary unemployment by continuing operations "under existing wages, conditions and contracts, pending continuance of negotiations," for periods of 30 days, 60 days 90 days or six months respectively, or until "ultimate success or failure to agree on a contract." According to the record the general proposal to continue operations for an indefinite period pending ultimate success or failure of the conference was made for the first time on March 16, 1939. This offer was unanimously voted down by the representatives of the operators. Thereafter, between March 16th and March 31st, the proposals for continued operations on a temporary basis for varying periods of time, pending negotiations, were submitted at various times by the miners' representatives and rejected by the operators' representatives. Without going into the merits of the controversy existing at this time, it would appear that the most natural basis for the temporary continuation of operations pending further negotiations would be on the basis of the then "existing wages, conditions and contract."

Inasmuch as the term "strike" connotes positive action by employees in the stoppage of work in order to secure more favorable terms, and inasmuch as the employees were not taking any positive action for the stoppage of work, but on the contrary were taking positive action to prevent the stoppage of operations by offering to continue to work upon the then existing terms on a temporary basis "pending continuation of negotiations and ultimate success or failure to agree on a new contract," and inasmuch as by custom, tradition and policy all employment relations in the past had been on the basis of written agreements entered into not between individual employers and individual employees but through representatives of each group in conference assembled, we conclude that the condition then existing was not a "strike" within the meaning of the Act. The frequent offers on the part of the employees to continue operations completely negative the idea of a stoppage of work by the employees or that the employees refused or were unwilling to continue the employment. At this point a number of things might have occurred. The operator's representatives might have voted "yes" instead of "no" on the offers of continued operations in which case there would have been no cessation of employment. The conference might have terminated by appropriate action of the delegates, or by mutual agreement. In the event of such a termination of the conference the question of whether a strike, a lockout, or a suspension of operations by mutual agreement ensued would have been dependant upon the conduct of the parties. The fact is, the conference continued with the mines idle until an agreement was reached.

The employer claims that the operators desired to work but the men failed to respond. A careful examination of the record does not disclose any instance of the employers communicating this desire to the employees. Certainly the representatives of the operators in joint conference assembled by refusing to continue operations in pursuance of the offer of the employees did not indicates any such desire upon their part. If we examine outside of the proceedings of the conference which we consider entirely unnecessary we find that the operators in the field did not express formally or informally a desire on their part to operate their mines during the joint conference. No requests or notices were sent to the men requesting them to work. Neither were any of the procedures adopted such as posting work signs, sounding of whistles, or notifying the men to come to work.

It is a matter of particular significance that the proffers of continued operations pending final settlement all came from the miners' representatives only to be rejected by the representatives of the operators. It is, of course, true that the operators were not in any sense obliged to accept these proffers of continued operations. On the other hand, when for reasons best known to themselves, whether for the purpose of securing tactical advantages in their

negotiations, or for other reasons, they declined to accept these offers, can it logically be said that the responsibility for the cessation of operations was that of the employees, and that, therefore, **ipso facto** upon the termination of the agreement the employees became strikers? We think not. We think that the best that can be said on behalf of the postion of the operators is that there was a suspension or cessation of operations by mutual assent due to the expiration of the basic agreement by limitation of its terms.

An indication of this may be found in the terms of the resolution adopted on March 28th, whereby the **"Joint Conference** authorizes the continuance of work by all necessary maintenance men at the present wages for their services on their respective classifications plus any increase or adjustment that may come in working out the basic agreement which shall be retroactive as affecting these men as of April 1, 1939."

An analysis of this resolution discloses an intention on the part of both operators and miners that in the event of expiration without a new agreement that there shall be a temporary suspension of operations and that both miners and operators shall co-operate in maintaining the mines in good condition pending further negotiations. This is substantial evidence of cordial mutuality and the direct antithesis of the legal concept of adversary strike activities. However that may be, the record is clear as to the proceedings in joint conference that there was an expiration of the basic agreement by limitation to the temporary extension or continuance of which the operators expressly objected, as shown by their acts and conduct in conference assembled.

For all of these reasons, our conclusion is that the condition existing upon the expiration of the basic agreement was no strike, no lock-out, but merely a state of inertia due primarily to the expiration of the basic agreement. without immediate renewal or revision of its terms and due secondarily to the refusal of the operators to accept the offers of the miners on the same terms and conditions, for a continuation of operations pending "continuance of negotiations and ultimate success or failure to agree upon a new contract."

Entertaining these views, which we believe are in harmony with the purpose, intent, spirt and letter of the Act, and the facts and circumstances of the case, we believe that the claimants should not be denied benefits on the ground that they were on "strike".

As to the assignments of error concerning eligibility, while this question appears not to have been raised in the hearing before the board of review, we are convinced from an examination of the stipulations and evidence admitted thereunder, that the necessary prerequisites as to eligibility were satisfactorily established by the claimants and that the plaintiff failed to present any evidence to the contrary. Therefore, we sustain the finding of the board of review in respect to these assignments of error.

As to the assignment of error having to do with the exclusion and admission of evidence we find no error in the record prejudicial to the rights of the plaintiff. The principal complaint in this respect appears to be that the board of review rejected testimony relating to outlying districts so-called. which are not part of the Appalachian. Joint Conference. This testimony was in our opinion immaterial and irrelevant to the issues and was properly excluded by the board of review. We find no other errors on the face of the record and it is our conclusion that the decision of the board was not unlawful, unreasonable, or against the manifest weight of the evidence. Therefore, the decision of the board of review is affirmed.

Exceptions are allowed to all proper parties.